### IOWA CITY, JUNE TERM, A. D. 1857.

#### In the Twelfth year of the State.

PRESENT:

HON. GEORGE G. WRIGHT, Chief Justice.
" WM. G. WOODWARD, } Justices.
" L. D. STOCKTON,

| 5 | 1 |
| 85 | 42 |
| 5 | 1 |
| 126 | 696 |

## Casey *v.* Harned, as County Judge.

Where two acts of the General Assembly are repugnant to, or in conflict with, each other, the one last *passed*, being the latest expression of the legislative will, must govern.

But if by any fair and reasonable construction, a prior and later statute can be reconciled, both shall stand.

Ordinarily, the intention of the legislature to repeal a statute, or any part of it, is manifested or shown by the use of *express* repealing words or terms, or by the use of such language as is equivalent to an express repeal.

Repeals by implication, are not favored by the Courts.

Effect will be given to several statutes upon the same subject, if possible.

The act entitled "An act to relocate the County Seat of Keokuk County," approved January 24, 1855, is not so far in conflict with the act entitled "An act in relation to County Seats," approved January 22, 1855, that both may not consistently stand; nor does the former act necessarily, or by implication, repeal the latter so far as it applies to Keokuk County.

The only effect of the word "*forever*" in the first section of the act to

Casey v. Harned, as County Judge.

relocate the County Seat of Keokuk County, approved January 24, 1855, is, that the place selected as the County Seat under that law, shall remain the County Seat until changed by law.

The right of the citizens of Keokuk County, to vote on the subject of the relocation of their County Seat, under the act of January 22, 1855, was not taken away by the special act for the relocation of the County Seat of Keokuk County, approved on the 24th of the same month; and the County Judge of that County, being properly petitioned, had full power to submit such question to a vote of the people at the April election, 1856.

### Appeal from the Keokuk District Court.

### WEDNESDAY, JUNE 3.

This is a proceeding by *certiorari*, requiring the County Judge of Keokuk County, to return to the District Court, the facts attending an election held under the act entitled "An act in relation to County Seats," approved January 22, 1855, and the removal of the County Seat of that County from Lancaster to Sigourney, in pursuance of said election. The return having been made, and the cause heard, the District Court affirmed the proceedings of the County Court. From the judgment of the District Court, the plaintiff appeals. The facts of the case will appear from the opinion of the Court.

*Knapp & Caldwell*, for the appellant.

The intention of the legislature must be looked to. This is the polar star in the construction of statutes, and must be followed, even when it may seem contrary to the letter. 6 Bac. Abr. statute 1, No. 5; *Church* v. *Crocker*, 3 Mass. 21; *Holland* v. *Pierce*, 8 Mass. 418; *Somersett* v. *Dighton*, 12 Mass. 393; *Jackson* v. *Collins*, 3 Cowen, 89; *Preston* v. *Browder*, 3 Peters (Cond.) 508; *Holbrook* v. *Holbrook*, 1 Pick. 250; *Beall* v. *Harwood*, 2 Har. & John. 171.

We claim that the special statute took effect July 1st, 1855, and having been passed and approved two days subsequent to the approval of the general law, operates as a repeal of so much of the general law as relates to Keokuk county.

Casey v. Harned, as County Judge.

That it is a public act in contemplation of our statute upon that subject, will not be seriously controverted.

An act which extends to all persons within its territorial limits, is a public act. *Pierce* v. *Kimball*; 9 Maine, 45; 9 Greenleaf, 45.

In the case of *Cass* v. *Dillon*, 2 Ohio, 608, it was held that an act allowing the people of a county to take stock in a railroad, was a public act. In *Gorham* v. *Springfield*, 8 Shep. 58, it is held that acts incorporating towns are public acts. In *New Portland* v. *New Vineyard*, 4 Shep. 69, the same Court hold, that an act annexing one town to another, is a public act. In 7 Mass. 9, the Sup. Court of Mass. holds that acts fixing and defining the boundaries of counties, are public acts, &c.

The special act, so called, then, is a subsequent act, both with regard to its approval, and in the time of its taking effect, and is an affirmative statute. See also *Levy* v. *The State*, 6 Porter, 281, where the Court says: "To constitute a statute a public act, it is not necessary it should extend to all parts of the State. It is a public act, if it extends equally to all persons within the territorial limits described in the statute.

An affirmative statute is a repeal, by implication, of a previous affirmative statute upon the same subject. So, a subsequent statute, revising the subject matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must operate to repeal the former, to the extent to which its provisions are revised and supplied. *Commonwealth* v. *Crowley*, 1 Ashmead, 179; *Duncan* v. *Duncan*, 6 Porter, 28; *Norris* v. *Crocker*, 13 Howard, 429; *Livingston* v. *the State*, 5 Porter, 479; *Bartlett* v. *King*, 12 Mass. 537; *Miller* v. *Snyder*, 6, Porter, 1; *Rex* v. *Cator*, 4 Burr. 2026; *Nickols qui tam* v. *Squire*, 5 Pickering 168; *Commonwealth* v. *Kimball*, 21 Pick. 373; *McQuilkrin* v. *Doe. Ex dem Stoddard*, 8 Black. 581; *Leighton* v. *Walker*, 9 N. H. 59. If a subsequent statute be not repugnant in all its provisions to a prior one, yet if the later statute clearly intended to prescribe

the only rules which should govern, it repeals the prior one. 3 Howard (U. S.), 636. It is a sound rule of construction, that every clause and *word* of a statute, shall be presumed to have been intended to have some *force and effect. Opinion of the Justices,* 22 Pickering, 571.

We claim that the word *forever* in this special act, shall be deemed to have been intended by the legislature to have some *force and effect.* A statute ought to be so construed, if possible, that no clause, sentence, or *word* shall be superfluous, void, or insignificant. *Hutchen* v. *Nolle,* 4 Blackford, 148; *James* v. *Dubois,* 1 Harr. 285; *Crocker* v. *Crain,* 21 Wendell, 211; *Brown* v. *Wright,* 1 Green, 240; *Mason* v. *Finch,* 2 Scam. 223; *Daviess* v. *Fairburn,* 3 Howard, 363. Apply the doctrine of these, and the authorities hereinbefore cited, and what disposition will be made of this sentence in the special act: "*And which ever place shall receive the greatest number of votes cast at said election, shall be and remain forever the County Seat of said county.*"

It is said that to allow the special act the power of repeal, by implication, of so much of the general act as relates to Keokuk county, will render the latter unconstitutional; as so construed, it will not have a uniform operation. We answer, that the constitution does not control the construction of statutes, so as to prevent the giving full force to all legal implications. *Spencer* v. *State,* 5 Porter, 41. So in *Milne* v. *Hule et al.,* 3 McLane, 212, it is held that the constitutional provision of Ohio—"that the repeal of one act shall not revive another," &c.—does not apply to repeals by implication, but only to repeals by act of the legislature. We submit, in conclusion, that the proceedings had are void, as not having been conducted according to the requirements of the statute creating the power. There is no presumption that can obtain in favor of the regularity of the proceedings, and if there was, the returns show affirmatively that they were irregular. The proceedings had under this law, to determine the rights of the people of Lan-

caster, must be strictly in accordance with the requirements of the statute. *Commonwealth* v. *Metcalf*, 2 Mass. 118; *Commonwealth* v. *Shelton and others*, 3 Ib. 187; *Commonwealth* v. *Inhabitants of Cambridge*, 4 Ib. 626; *Inhabitants of Lancaster* v. *Eli Pope*, 1 Ib. 85; *Barre Turnpike Co.* v. *Appleton*, 1 Pick. 43.

*Wm. H. & J. A. Seevers*, for the appellee.

I. There is nothing but the common law writ of *certiorari* defined by statute, known to our law. Under such a writ, nothing can or will be inquired into, but the question of jurisdiction in the inferior Court. Code, sec. 1965–66; Bouvier, Title *certiorari*; *Starr* v. *Trustees of Rochester*, 6 Wend. 565; *People* v. *Goodwin*, 1 Selden, 568; *Allyn* v. *Comrs. of Schodack*, 19 Wend. 342; *Simpson* v. *Rhinelanders*, 20 Ib. 103; *Johnson* v. *Moss*, 20 Ib. 145; *Wilson* v. *Green*, 20 Ib. 189; *Ex parte Mayor of Albany*, 23 Ib. 276; *Birdsal* v. *Phillips*, 17 Ib. 464. In this last case, the authorities upon the question are examined by BRONSON, Justice, and some of the earlier cases in New York overruled. The language of the New York statute is given.

II. A subsequent special statute will not replace a previous general statute, by implication. *Goddard* v. *Boston*, 20 Pick. 407.

III. All laws of a general nature must have a uniform operation. Const. Art. 1, Sec. 6; Code 544. The law under which the Court below acted, was a general law. Laws of 1854, 71. It was constitutional when passed. The special act, passed at same session, (page 208), but subsequently, cannot make the general law unconstitutional. Such, however, must be the result of the general law, if read as if the special one was a proviso thereto. Read the general law thus: Provided this act shall not apply to Keokuk county. If such a proviso had been attached when the law was enacted, there could be no doubt upon the question. What difference can it make, if the proviso is enacted by a subsequent

act. That the legislature intended to do an unconstitutional act, the Court will never presume, through force of any rule of *construction*. It must clearly appear, and the Court will, if possible, avoid the difficulty, by *construing* the acts constitutional.

IV. A brief examination of the return, will show that the County Judge had jurisdiction. The proper steps had been taken. The return says sufficient notice was given. The County Judge so determined. This is sufficient. *Inhabitants of New Salem, Petitioners*, 6 Pick. 470; *Freetown* v. *Bristol*, 9 Pick. 46.

V. We claim that the act approved January 24, 1855, in relation to Keokuk county, is a private act, and went into force on the day of its passage. Code, 549, Sec. 27; Code, Sec. 20, 28 and 29; *Scott* v. *Clark et al.*, 1 Iowa, 78; 7 Bac. Ab. 444, note; Laws of 1854, 208.

VI. All acts upon the same subject should be construed together; and it is the duty of the Court to so construe, that all may stand. Repeals by implication are not favored. *Adams et al.* v. *Ashley*, 2 Bibb, 96; *Brown, Adm'r*, v. *Miller*, 4 J. J. Mar. 474; *Moore* v. *Miller*, 1 Litt. 357; *Thayer* v. *Dudley*, 3 Mass. 296; *Holbrook* v. *Holbrook*, 1 Pick. 248; *Mendon* v. *Worcester*, 10 Pick. 234; *Commonwealth* v. *Cambridge*, 20 Pick. 267; *Goddard* v. *Boston*, 20 Pick. 407; *Holland* v. *Makepeace*, 8 Mass. 418; *State* v. *Rockley*, 2 Black. 249; *Cass* v. *Dillon*, 2 Ohio S. 610; *Dodge* v. *Gridley*, 10 Ohio, 177; *Tonnelle* v. *Hall*, 4 Comstock, 144; *Peyonton* v. *Mosely*, 3 Mon. 77; *Weatherford* v. *Weatherford*, 8 Porter, 771.

VII. The word "forever," in the special law, amounts to nothing. The legislature could not bind themselves, or any subsequent legislature, by using such language. *Elwell* v. *Tucker*, 1 Black. 285; *Saum* v. *Jones County*, 1 G. Greene, 170.

WRIGHT, C. J.—On the 22d of January, 1855, the General Assembly passed "An act in relation to County Seats," which provides a method by which the citizens

of any organized county in this State, may take steps
for the re-locating of the seat of justice therein. This
act was to take effect from and after its publication in
certain newspapers therein named, and was published in
such papers on the 31st of January, 1855. On the 24th
of the same month, another act was passed, entitled
"An act to re-locate the County Seat of Keokuk
County," which, by its terms, was to "take effect and be
in force from and after its passage." The first act pro-
vides that the citizens of any organized county, desiring
a re-location of their County Seat, may petition the
County Court respecting the same. This petition is to
be presented at a regular term of said Court; signed by
at least one-half of all the legal voters of the county, as
shown by the last preceding census; shall designate
the point at which the re-location is to be made; and
thereupon, the proper notice of its presentation having
been given, the County Court is to order that a vote
shall be taken at the next April election, between the
place so designated and the existing County Seat. If
the place so designated shall obtain a majority of all the
votes cast, the said Court is required to make a record
thereof, and declare the same to be the County Seat, and
remove the records and documents thereto as early as
practicable.

The second act provides for an election on the first
Monday in August, 1855, for the purpose of determining
whether the County Seat of Keokuk county should be
removed from Lancaster to Sigourney, and expressly re-
cites that "whichever place shall receive the greatest
number of votes cast at said election, shall be and remain
*forever* afterwards the County Seat of said county." The
4th section of the act provides, as a condition of said
removal, if a majority of the votes shall be in favor of
Sigourney, that the county shall be secured in the sum of
Five Thousand dollars, to be paid into the treasury there-
of; and the 5th section enacts, that, in case of removal
under said act, the lot-holders in Lancaster shall be in-

demnified, by being paid from the County Treasury, the amount assessed by three commissioners therein named. Under this last act, a vote was taken at the August election, 1855, which resulted, as shown by the action of the board of canvassers, in favor of retaining the County Seat at Lancaster, but whether a majority of the votes cast were in fact in favor of that point, is still controverted by the parties interested in this litigation. See *Price & Wait* v. *Harned et al.* 1 Iowa, 473. Since the determination of that case in this Court, and at the April election, 1856, a vote was taken under the act of 22nd January, 1855, (or the one first above recited,) which resulted in favor of Sigourney, to which place the County Judge, as required by the law, removed the records and documents of the county. At the next term of the District Court, the plaintiff herein, applied for and obtained, a writ of *certiorari,* directed to the County Court, in substance requiring that Court to return the facts attending said election and removal. The return being made, the cause was heard, and the proceedings of the said County Court affirmed. The relator Casey, now appeals, and claims that the Court below erred in dismissing the writ, and holding the proceedings and election, and the orders under the same, legal and regular.

The appellant first insists, that the statute conferring the power to take this vote, must have been strictly pursued or followed; that no presumption can obtain in *favor* of the regularity of the proceedings; that it is the duty of the defendant, or the officers or agents conducting said election, to show affirmatively that the power was exercised in strict compliance with law; that this is not shown or does not appear; and that, therefore, the whole proceedings should be set aside. Without now stopping to enquire, how far this or the District Court will go behind the return made by the County Judge to the writ of *certiorari,* and inquire into the regularity of the proceedings, it is sufficient to say, *first,* that while we will not presume in *favor,* neither will we presume *against* the regularity of

siad election, or that the law was *not* complied with. In the second place, while it has been said in argument, that some of the notices of said election are defective, or that there is no sufficient proof of the service or posting of the same as required by law, yet no defect of the kind has been brought to our attention. And finally, that we have examined the entire documentary evidence before us, and see nothing to sustain the objection. The whole proceedings appear to have been conducted with great care, and a studied effort to comply with every provision or requirement of the statute. The record does show affirmatively, without the aid of any presumption, that the power was exercised in strict compliance with the law conferring it.

The only remaining question in the case, is one of more importance and difficulty. And that question briefly stated, is this: does the act of January 22d, 1855, apply to Keokuk county, or was it repealed so far as that county is concerned, by the subsequent act of the 24th of the same month? In determining this question, or in giving a construction to these statutes, our simple duty is, to ascertain and carry out the intention of the law-making power; and this intention, if practicable, we are to arrive at from the language used. In giving a construction of such language, however, certain rules obtain, which when kept before the mind, will divest the case at bar of much of its supposed intricacy. This difficulty or intricacy arises from conflict between the two acts, as a consequence of which, it is claimed that the first, so far as it applied to Keokuk county, is repealed by the second. Where two acts of the General Assembly are repugnant to, or in conflict with, each other, the one last *passed*, being the latest expression of the legislative will, must govern. But this rule is no better settled than the further one, that if by any fair and reasonable construction, a prior and later statute can be reconciled, both shall stand. Under these two rules, the act of the 24th of January, if in conflict with that of the 22d of the same month, would govern, unless

by some fair and legitimate reasoning, any seeming conflict may be reconciled.

But without, at present, applying these rules, let us refer to some others which assist the judicial mind in arriving at a conclusion. Ordinarily, the intention of the legislature to repeal a statute, or any part of it, is manifested or shown by the use of *express* repealing words or terms, or by the use of such language as is equivalent to an express repeal. If it can be avoided, no court will conclude that a statute is repealed, by implication.

Such repeals are not favored. Effect will be given by courts to several statutes upon the same subject, if possible. *Goddard* v. *Barton*, 20 Pickg. 407; *Harriman* v. *the State*, 2 G. Greene, 270; Bac. Abridg. Statute D.; *Dodge* v. *Gridley*, 10 Ohio, 173; *State* v. *Rackley*, 2. Blackf. 249; *McCartler* v. *Orphan Asylum Society*, 9 Cow. 437; *Bowen* v. *Lease*, 5 Hill 22; *Spencer* v. *The State*, 5. Ind. 41.

In the case before us, there is no pretence for claiming that the *general* statute, (as we shall style the one passed January 22d,) is repealed in *express* words, by that of the 24th, (and which, for the sake of distinction, we shall designate as the *special* act or statute.) Nor is there any language used which can be said to be *equivalent* to an express repeal. Are the two statutes, then, so far in conflict with each other, that both may not consistently stand, or does the special statute necessarily or fairly, by implication, repeal the general one, so far as it applies to Keokuk county? And these questions, we are clearly of the opinion, must be answered in the negative. There is not the remotest reference made in the special statute, to the general one. The first confers the right upon each and every county in the state, to take steps for re-locating their county seats. The right is given by this act, not to any *particular* county, but to *every* county. It is given, not for one year or any definite length of time; but at any subsequent April election after the taking effect of the law, upon proper petition, an election may be held. If

in any county, a majority shall be in favor of a re-location, the county records, documents, and offices, are to be removed, and no condition is attached, such as that lot holders in the former County Seat, shall be indemnified, or that a sum of money shall be secured to the county by those interested in the new seat of justice.

·The *special* statute is confined to a particular territory or county; provides for an election at a particular time; no petitions are necessary prior to ordering said election; and provisions are made for indemnifying lot holders in Lancaster, and securing the county against loss, before, under such law, a removal can take place, whatever the will of the majority.    Now, where is there any such repugnancy between these two statutes, that both may not stand—that both may not consistently apply to Keokuk county?    In permitting both laws to be thus applied, there is no such conflict as arose in *Spencer* v. *The State*, and other cases, relied upon by appellant, from 5 and 6 Ind.    In those cases, the question was of this character.    On the 14th of May, 1852, the legislature of Indiana authorized the Courts of Common pleas of that State to take cognizance of felonies in certain specified cases.    Eighteen days after this, the same legislature passed an act organizing their Circuit Courts, and giving to such courts "*original exclusive jurisdiction in all felonies.*"    The latter was held to be in conflict with the former law, and to oust the Common Pleas of all jurisdiction in cases of felony.    But that was quite a different case from the one before us.    The special statute in the case at bar, does not, directly nor indirectly, expressly nor impliedly, provide that the *only* method for removing or re-locating the County Seat of Keokuk county, is the one therein pointed out.    If the statute organizing the Circuit Courts in Indiana, had given to those Courts jurisdiction in cases of felony, without specifying that it was to be exclusive in all felonies, and their Courts had held that the latter repealed the former law, then the cases referred to would have been more applicable.

But it is claimed by appellant, in the language of some

of the cases, that though a subsequent statute be not repugnant in all its provisions to a prior one, yet if the latter statute clearly intended to prescribe the only rules which should govern, it repeals the prior one: and that a statute which revises the subject matter of a prior one, and which was evidently intended as a substitute for it, although it may contain no express words to that effect, must operate to repeal the first one, to the extent to which its provisions are revised and supplied. To give pertinency to the argument drawn from the cases recognizing these rules, several things would have to be conceded in the case before us. In the first place, we would have to asume that the special statute *clearly intended* to prescribe the only *rules* which should govern the re-location of the County Seat of this county; or in the next place, we must take it for granted, that the last act *revises* the subject matter of the former one, and was *evidently intended as a substitute for it*. Now, what is there to show, that the legislature clearly intended, that the special statute was to be the only one, fixing rules on this subject? What ground is there for claiming that the first law is revised by the former, or that the last was *evidently intended* as a substitute for the first? In no sense can it be said, that the subsequent statute is a *revision* of the prior one. It does not profess to do so—neither has it the first feature tending to show it to be such. To revise, is to review or re-examine for correction, and when applied to a statute, contemplates the re-examination of the same subject matter contained in the prior statute, and the substitution of a new, and what is believed to be, a still more perfect rule. And hence, if the last act in the case before us, had been a general law upon the subject of re-locating County Seats, and it could be clearly seen that it was intended to revise the former one, and to be substituted for it, the doctrine relied upon might have some force. Not so, however, when such latter act is special, and strictly local in its character; where it makes no reference to the general statute; where it does not pretend to prescribe any rules upon the subject of the

prior one; and when there is nothing in the least tending to show that the second is a revision of the first.

And there is even less weight in the position, that the special statute was intended to prescribe the only rules which should govern the re-location of this County Seat. It did prescribe the rules under the special election therein contemplated, and had there been a prior law, providing for the re-location of the seat of justice of that county, and it clearly appeared that this subsequent statute supplied the only rules to govern the same,—the first would be repealed, though the two might not be repugnant in all their provisions. But what rules in the general law, can it be said are clearly provided for, and designed to be supplied by those in the special act? What is there in the subsequent act, leading to the conclusion that the citizens of Keokuk county could never, at any time after the first Monday in August, 1855, take steps to re-locate their County Seat? And the consideration of this last inquiry, brings us to another position assumed by appellant, and that is, that the use of the words *forever* in the special act, clearly shows that the legislature intended that the general law should not apply to Keokuk county. It is a sound rule of construction, say counsel, that every clause and *word* of a statute, shall be presumed to have been intended to have some *force and effect;* and therefore, say they, the word *forever* must have some force and effect. Grant it, and how does the case stand? It is admitted that the right to remove County Seats, is an attribute of the law making power, and that notwithstanding the legislature in ever so strong language had provided against any subsequent legislation on that subject, yet that any and every after General Assembly, might repeal, alter, amend, or pass other and any different laws—might at every session change the County Seat—might provide for a new vote to be taken for the re-location; and that the legislature cannot fix a County Seat *forever* at a particular place. In short, it is admitted that notwithstanding the use of this term, the next session of the legislature could have pro-

vided for another vote between these two or other points in the county. And thus it is conceded, that this provision of the special act, could not *prevent* the legislature from removing the County Seat from Lancaster to Sigourney, or from Sigourney to Lancaster, or from providing for subsequent steps for re-locating by a vote of the people. All the force and effect that the word *forever* has, therefore, is, that the place selected under that law, should remain the County Seat until changed by law; and this change could as well be provided for by law—and especially one general in its nature—passed *before* as *after* such special statute. Suppose at a prior session of the General Assembly, a general law had been passed for re-locating County Seats, could there have been any fair ground for claiming, that such law was in fact repealed, because years afterwards a law providing for a special vote for one county, was passed, which contained a provision that the place thereby selected shall *forever* remain the County Seat? And if not, can there be any more ground for such claim, where the general law was passed at that same session?

We conclude, therefore, that the right of the citizens of Keokuk county to vote on the subject of the re-location of their County Seat under the act of the 22d of January, 1855, was not taken away by the special act of the 24th of the same month; and consequently that the County Judge of that county, being properly petitioned, had full power to submit such question to a vote of the people at the April election, 1856. And we thus determine that the judgment of the District Court must be affirmed, without considering the objection that the relator, Casey, had no right to institute this proceeding; without deciding whether the special act is public or private in its character; and without noticing the further point, that if the special act repealed the general act *pro tanto*, the general statute would be rendered thereby unconstitutional, in view of that provision of the constitution which requires all laws of a *general* nature to

have a uniform operation.    These questions it is unnecessary to enter upon at this time.

Judgment affirmed.