The State v. Shaw.

---

## THE STATE v. SHAW *et al.*

1. **Conveyance:** CONSTRUCTIVE NOTICE.   A purchaser or incumbrancer will be charged with constructive notice of every thing appearing in any part of the deeds or instruments which constitute the title, and which is of such a nature that, if brought directly to his knowledge, it would amount to actual notice.

2. —— OF LOTS IN ADDITIONS : SUFFICIENCY OF DESCRIPTION.   Where lots lying in an *addition* to a town are described in a conveyance as being in a certain block of the town itself, such conveyance will, when brought home to the knowledge of a subsequent purchaser, operate as notice of the identity of the property, when it appears that no such numbered block is contained in the plat of the town as filed, and the addition is, in fact, a part of the town itself.

3. **Principal and agent:** PUBLIC OFFICER : RATIFICATION.   Where a public officer loaned the school money of the State without authority of law, and took mortgages from the borrowers to secure such

loans, it was held competent for the State to so far ratify the unauthorized acts as to avail itself of, and enforce, the securities thus taken, not only as against the mortgagors, but as against subsequent purchasers and incumbrancers.

4. Tax sale: SCHOOL FUND MORTGAGE. The interest of the State in property mortgaged to the school fund and held by it as security, will not, under section 811 of the Revision, be affected by the sale of such property for taxes. The interest of the mortgagor only is affected. This rule applies to all sales made after the enactment of said section, whether the taxes accrued after or before.

5. —— Said section 811 was not repealed, either directly or by implication, by chapter 45 of the Revision.

6. Statutes: IN PARI MATERIA : CONSTRUCTION OF. All statutes *in pari materia* are, for the purpose of arriving at the legislative intent, to be taken together and examined as if they were but one law, though made at different times and not referring to each other.

7. —— Statutes are *in pari materia* which relate to the same person or thing, or to the same class of persons or things.

8. —— REPEAL BY IMPLICATION. In order to work the repeal, by implication, of an old law, by the enactment of a new one, there must be an absolute repugnancy between the two.

9. Tax sale: BY MUNICIPAL CORPORATION. Under the special charter of the city of Des Moines the council had no power to authorize the mayor to execute tax deeds for lots sold by the city at tax sale, where it had not been empowered so to do by a vote of the electors of the city, taken as prescribed by the charter. § 19, act January 28, 1857.

10. —— FORECLOSURE OF TAX TITLE. Under the law in force prior to the Revision of 1860, the purchaser at a tax sale was required to foreclose his tax deed by the proper action, as in case of a mortgage, in order to perfect his title : and this law applied to sales by a city as well as to those by a county. Act of 1858 ; Rev. § 1144.

11. School fund: CHAPTER 94, ACT OF 1864. Under chapter 94, Acts of the Tenth General Assembly, the State was authorized to foreclose the school fund mortgages therein excepted from the satisfaction of liens which was provided by the act to operate upon the conveyance of the " Capitol Building " to the State.

*Appeal from Polk District Court.*

MONDAY, OCTOBER 11.

ACTION in chancery to foreclose a mortgage. Decree for plaintiff. Defendants E. J. Ingersoll, James Callanan, Jr., and James A. Williamson appeal. The facts of the case appear in the opinion of the court.

*Phillips, Gatch & Phillips* and *J. Callanan* for the appellants.

*Thos. F. Withrow* for the appellee (the State).

*C. C. Nourse* for the defendant Warren Hussey.

BECK, J. — On the 27th day of June, 1856, the defendants Alexander Shaw and wife executed a mortgage to James D. Eads, as superintendent of pub-
1. CONVEYANCE: lic instruction, to secure the sum of $3,000,
constructive notice. money of the school fund of the State, borrowed by Shaw of said Eads as a public officer. The mortgage covers lots 9, 10, 11 and 12, in block 5, in the "*Town of DeMoine*," and also other lands. On the 24th day of January, 1859, Shaw and wife executed a trust deed to J. E. Hull, to secure a note of $391, executed by Shaw to defendant E. J. Ingersoll. The deed describes the property conveyed in the following words: "Lots 9, 10, 11 and 12, in block No. 5, in W. A. Scott's addition to Des Moines city, now included in the corporate limits of Des Moines, Polk county, Iowa. Said lots, fronting on Tenth street, and lying between Walnut street and Court avenue, and being the premises now occupied as a residence of the parties of the first part." The property was subsequently (September 6, 1862) sold upon this

deed of trust, and in accordance with its terms, to the *cestui que trust*, defendant Ingersoll.

The questions to be properly considered first, arise upon the foregoing statement of facts.

I. The plaintiff claims, and so avers in the petition, that there was a mistake in the description of the town lots conveyed by the mortgage, of which foreclosure is asked; that the description should have been, "lots 9, 10, etc., in block 5, in *W. A. Scott's addition to De Moine*," which was, in fact, the correct description of the property actually intended to be conveyed by the mortgage. Plaintiff asks in the petition that the mortgage may be declared a lien and foreclosed upon the said property intended to be conveyed therein.

The appellants, Callanan, Ingersoll and Williamson, resist the foreclosure, as to the town lots, for the following reasons:

.1. The mortgage, on account of the misdescription, was not sufficient to impart notice to subsequent incumbrancers or purchasers.

2. The act of Eads, as superintendent of public instruction, in loaning money of the school fund, was unauthorized by law and illegal, and no subsequent ratification by the State would defeat a lien or title acquired after the execution of the mortgage and before the ratification; and as to such lien or title the mortgage is void.

We will proceed to notice these points made by appellants. It will be necessary, however, to make further statements of facts, disclosed by the record, applicable to the questions here raised. The facts, however, as they bear upon each question, will be separately and distinctly stated. Those bearing upon the point first stated will be first given.

The property involved in this suit was conveyed by W. A. Scott and wife to defendant Shaw by identically

the same description given to it in the mortgage by Shaw to Eads. Scott was the proprietor, or one of the proprietors, of De Moine. The property, of which Shaw's lots constitute a part, lies contiguous to the town then called " De Moine," in fact, is a part of the same tract of land upon which the town was laid off, but for some reason the plat was not filed for record at the same time with the plat of the town of " De Moine." It was afterward filed. In numbering the blocks in the town certain numbers were omitted, or, in other words, the numbering began at block 8. When the addition was made the blocks therein supplied the place of these omitted numbers in the plat of the town, so that, in fact, block 4 of Scott's addition corresponded precisely with that block in the town had it been platted with uniformity. There was then, in fact, no block 4 in " De Moine," but block 4, Scott's addition, in location occupied the place of that block had the plan of the town been extended with uniformity of numbering in the blocks.

In view of these facts, did the mortgage to Eads impart notice to subsequent purchasers or incumbrancers that lots 9, 10, 11 and 12 in block 5, W. A. Scott's addition to De Moine were incumbered thereby ?

It is an admitted rule that a purchaser will be charged with constructive notice of every thing appearing in any part of the deeds or instruments which prove and constitute the title purchased, " and is of such a nature that if brought directly to his knowledge it would amount to actual notice." 2 Leading Cases in Eq. (Hare and Walace's Notes), p. 168 (note to *Le Neve* v. *Le Neve*); *Harris* v. *Fly et al.*, 7 Paige Ch. 421 ; *Johnson* v. *Guothiney*, 4 Litt. 320 ; *Honore's Ex'r* v. *Bakewell*, 6 B. Monr. 67.

In the deed of Scott to Shaw, the lots are described as in the mortgage. This deed is a part of Ingersoll's title; he therefore had notice that the property covered by

the deed of trust was originally conveyed by the same
description to Shaw, under whom he claims
title, as that by which it was afterward mort-
gaged by the same party, and, by consequence,
that the property, described as "lots 9, 10, 11 and 12,
block 5, in the town of De Moine," was the identical
property described in the trust-deed, and in the deed of
the trustee to himself.    This, if brought directly to his
knowledge, would amount to actual notice.    The mort-
gage to Eads, as superintendent of public instruction, did
impart notice to him that "lots 9, 10, 11 and 12, block 5,
in the town of De Moine," were conveyed therein.    The
deed of Scott to Shaw, as we have seen, imparted notice
to Ingersoll that the property thus described was identi-
cally the same that is covered by the trust-deed, and the
deed of the trustee to him.    We conclude, therefore, that
the mortgage operated as notice to Ingersoll that the lots
to which he claims title were conveyed therein.

II. We are satisfied from the evidence that Ingersoll
did have actual notice of the mistake in the description
of the property conveyed by the mortgage.    Upon this
point the direct evidence is conflicting, Shaw testifying to
the fact, and Ingersoll denying it.    The circumstances and
attendant facts disclosed by the record, to our minds, satis-
factorily sustains our conclusion.    We will not mention all
of them, but only the most prominent and leading ones.
As we have above stated, there was no block in the town
of "De Moine" answering to the description given in
the mortgage — Scott's addition being the completion of
the plan of the town by continuing the consecutive num-
bering of its blocks.    In this addition the block num-
bered to correspond with the one mentioned in the mort
gage is found.    The proprietors of the town conveyed
and contracted to convey lots in "Scott's Addition," de-
scribing them as in the "town of De Moine."  ·  This is

2. ——— of lots in
additions: suf-
ficiency of de-
scription.

The State v. Shaw.

all explained by the fact that the original survey of the lands intended to be laid off into lots made no distinction as to the part afterward called " Scott's Addition," but included it in the town. When the plat of the town was filed for record, the part afterward described as the addition was omitted, that certain changes might be made, but the plat of the addition was afterward filed without any change in the survey thereof, and as it appeared originally.

Ingersoll admits that he knew the property in dispute was occupied as the homestead of Shaw, and that he knew of the existence of a mortgage held by Callanan and Ingham, upon the property ; in this mortgage it is described as being in De Moine, and as the residence of Shaw, and no mention is made of Scott's addition. These facts, taken in connection with the important circumstance before mentioned, that the property is described in the deed from Scott to Shaw, under which Ingersoll claims title, as in the mortgage, all go to satisfy us that Ingersoll could not have been ignorant of the existence of the mortgage.

The position which Ingersoll occupies is inconsistent with his defense based upon the mistaken description. He claims title to the property under a deed from Scott to Shaw, describing the property precisely as it is described in the mortgage, which he resists because of such defective or incorrect description. Common sense would seem to teach that if such description is sufficient to support *his* title, it ought to be sufficient to support the title or claim of another. This view seems to be the foundation of the rule above announced, under which we hold that the deed of Scott to Shaw, and the mortgage, operated as constructive notice to Ingersoll that the lots described therein were the identical property conveyed by the trust-deed, and the deed of the trustee.

Vol. XXVIII. — 10

III. Another view of this point brings me to the same conclusion. It is this: Scott's addition to the town of "De Moine" became a part of that town, so far, at least, as to be properly designated by its name. In referring to the .addition as a distinct and separate part of the town it would be proper, and perhaps necessary, to use the terms, "Scott's addition to the town of De Moine;" but in referring to the whole town, as made up of that addition and other constituent parts, the general name, "De Moine," would include the addition without the use of other words. In short, the addition was a part of the town and included in the name, " De Moine." Now, suppose a street is located wholly in this addition, bearing a particular name, and no other street in the town has the same name. In order to designate this street with perfect certainty its name only need be given, with the statement that it is in "De Moine." It would not add explicitness to say the street is in the addition. The whole includes the parts; the name "De Moine" includes the additions thereto; and if there were no other street of the same name the highest certainty, in order to give the precise locality of the street, would require only its name. The same theory is true of the blocks into which the town is divided, if they are called by particular names; so, in case they are designated by letters; and it is equally so, designated as they are, by numbers. The addition is a part of the town; block 5 is found there, and nowhere else. It seems to me that it is described with perfect certainty as "Block 5 in the town of De Moine."

In this view the property intended to be conveyed by the mortgage was sufficiently described therein, so that the mortgage itself operated as notice to Ingersoll of the lien created thereby, and so I am content to hold.

The State v. Shaw.

IV. It is insisted by appellants, that the act of Eads in loaning money of the school fund to Shaw was illegal, and that the mortgage, until the act was ratified by the State, was void, and could not divest the rights of parties accruing between the dates of the mortgage and of its ratification.

*3. PRINCIPAL AND AGENT: public officer: ratification.*

It is not necessary to discuss the proposition, which is not disputed, that the act of Eads in loaning the school fund money was unauthorized by law. Admitting the proposition, it by no means follows that the mortgage, in any sense, was void as to Shaw or as to any subsequent incumbrancers or purchasers. If the loan was made from the funds of the State by an unfaithful officer, who, however, protected the State by taking the mortgage, Shaw could not be heard to deny its validity; neither can his privy in estate claim an interest in the lands mortgaged. If Shaw is estopped to deny the validity of the mortgage, and the State never repudiated it, I am at a loss to see any reason why Shaw's grantees can insist that it is void. Between the date of the execution of the mortgage and the date of the trust-deed under which Ingersoll claims title, the State did not repudiate the mortgage, but, on the contrary, recognized it as a valid instrument, securing the amount therein named to the State. By section 2, act of January 28, 1857 (Laws 6th General Assembly, p. 244), certain agents, to be appointed by the governor, are directed to investigate the character of " all pretended loans of school money made by the superintendent of public instruction, and the value and kind of securities given for such loans; to obtain further and additional security thereon when and where deemed necessary; to institute suits for the recovery of the money as having been obtained without authority of law when such security is declined or refused, and to do such further acts as may be deemed necessary to secure

the safety of the common school fund." By this provision the State unquestionably ratified and adopted the acts of the superintendent of public instruction in loaning the school fund in all of those cases where the security was ample and the interest of the fund sufficiently protected thereby. In such cases the agents had no authority to treat the loans as transactions without authority of law, and sue for the money as obtained in that way. It appears that the loan to Shaw was considered amply secured, and as such was ratified. In this the State, while not sanctioning and approving the illegal acts of an unfaithful officer, acted with the prudence that may always be expected from those who wisely conduct business matters, and with becoming justice. To have repudiated the loans which were well secured would have involved the necessity of recovering the money from the officer and his securities, thus subjecting citizens to litigation and probable loss. By pursuing the course pointed out in the law, the interest of the State was protected, and those who really received her money were held liable for it. We are clearly of the opinion that the act above referred to operated as a ratification of the loans that were well secured, so far as to give the State full authority to enforce the securities taken for them. This ratification when made had the same effect as an original authority, and the transaction was thereby made valid from the beginning. See Story on Agency, § 244, *et seq.*, and authorities cited.

The defendant, Callanan, holds certain tax titles to the town lots, and also to the lands upon which the mortgage

4. TAX SALE:
school fund
mortgage.

is foreclosed by the decree. The tax titles to the lots, which we shall first notice, are based upon the sale thereof, made by the city of Des Moines; the first, December 31, 1860, for the delinquent city taxes of 1858 and 1859; the second, December 7, 1863, for delinquent city taxes of 1860, 1861 and 1862.

The tax title to the land is based upon a sale made on the 1st of August, 1861, for the delinquent State and county taxes for the years 1856, 1857 and 1858.

As we have seen, the property was mortgaged to secure a loan of money by the superintendent of public instruction; this money was a part of the school fund of the State, and the State so far ratified the transaction as to acquire full authority to enforce the security so taken. This ratification operated to make the transaction valid from the beginning. Section 811 of the Revision provides that, in cases where real estate is mortgaged to the school fund, the interest of the person who holds the title shall alone be sold for taxes, and the interest of the State shall not be affected by any sale of such property for taxes. This provision exempts lands so mortgaged from tax sales that will divest the lien of such mortgage, and the purchasers at the sales only acquire the right to redeem from the mortgage. This provision is applicable to all sales for taxes made after this provision took effect, July 4, 1860, whether the taxes became delinquent before or after that date. *Jasper County* v. *Rogers*, 17 Iowa, 254; *Helphrey* v. *Ross*, 19 id. 40; *Crum* v. *Cotting*, 22 id. 423.

It is argued that section 811 is repealed by the act of April 3, 1860, Revision, chapter 45. This chapter pro-

6. STATUTES: in vides for the levy and collection of taxes as pari materia: construction of. revenue, and the sale of lands when the taxes thereon remain delinquent and unpaid. It was enacted the day following the enactment of section 811, and, it is insisted, operates to repeal that section both by implication and by direct provision. Chapter 45 makes no exceptions as to the levy of taxes upon lands mortgaged to the school fund, or the sale thereof for delinquent taxes; section 784 provides that a deed executed for land sold for taxes " shall vest in the purchaser all the right, title,

interest and estate of the former owner in and to the land conveyed;" section 808 repeals all laws conflicting with the provisions of this chapter. The argument in support of the position that section 811 is repealed is based upon these provisions.

It is a well-settled rule that all statutes in *pari materia*, for the purpose of arriving at the legislative intent, are to be taken together and examined as if they were one law, though enacted at different times and not referring to each other. "Statutes are in *pari materia* which relate to the same person or thing, or to the same class of persons and things." *United Soc. v. Eagle Bank*, 7 Conn. 457. Under this rule, section 811 must be construed as though it were a part of chapter 45. It is not in its provisions repugnant to that chapter. It is designed to protect the interest of the school fund by providing that the lien for taxes shall not be paramount to mortgages given to secure that fund. The provision is most necessary for the protection of the fund, and required by good policy. Without it large sums would be lost to the fund by sales for inconsiderable amounts of delinquent taxes. To uphold the provision by no means requires us to hold void any part of chapter 45; the two are harmonious and consistent. Section 811 is not, therefore, repealed by section 808, not being in conflict therewith.

It is insisted that section 811 is repealed by chapter 45 by implication, that chapter covering the whole ground of the subject of the first named and all prior provisions. But this is not correct in fact, for the later statute, chapter 45, does not cover the subject of section 811, which is the protection of lands mortgaged to the school fund from tax sales.

In order to work the repeal, by implication, of an old law by a new one, there must be an absolute repugn ncy between the two. *Wood v. United States*, 16 Pet. 342.

Repeals by implication are not favored by the courts, and effect will be given, if possible, to several statutes in *pari materia*. *Casey* v. *Harned*, 5 Iowa, 1; *Hummer* v. *Hummer*, 3 Green, 42; *The State* v. *Smith*, 7 Iowa, 245; *Baker et al.* v. *Steamboat Milwaukee*, 14 id. 214; *Allen* v. *Pegram*, 16 id. 164; *Burke* v. *Jeffries*, 20 id. 145; *Yant et al.* v. *Brooks et al.*, 19 id. 87.

There is no repugnancy between the statutory provisions in question, and we cannot by construction raise a conflict between them. The provisions may all be sustained with entire harmony in the law.

Callanan did not, therefore, obtain title to the lots and lands by the tax sales and deeds under which he claims. He acquired only the right to redeem from the mortgage.

V. Defendant Callanan claims title to said lots, also, under a deed from the mayor of Des Moines. It appears **9. TAX SALE: by municipal corporation.** that the lots were sold for taxes prior to July 4, 1860, when section 811 of the Revision went into force, and were bid in by, and a tax deed therefor made to, the city. The mayor, under an ordinance, conveyed the lots to Callanan. There are three objections made to the title thus acquired. The first is, that it does not appear that, under the charter of the city, it had the power thus to acquire title to real estate by tax sales. Without determining, however, whether that power can be exercised by a city unless expressly conferred by its charter, we are of opinion that the title is defeated by the other objections, the first of which is, that the conveyance was made by the mayor without authority. We find nothing in the charter then in force empowering the mayor to convey lands of the city. By a provision of the charter (§ 19, act Jan. 28, 1837) the city council were prohibited from selling any real estate belonging to the city unless upon the vote of the electors of the city, to be taken as therein prescribed. It does not

appear that such vote was taken and the council empowered to authorize the mayor by ordinance to convey the property.

VI. The next objection is equally fatal. The sale under which this title accrues was made in August, 1858, for the taxes of the year 1857. Under the law then in force and governing the sale and the title acquired under it, the purchaser was required to foreclose the tax deed by proper action, as in the case of a mortgage. Code 1851, §§ 506–508 ; Rev. § 1144 ; *Street* v. *Hughes*, 20 Iowa, 131. This was not done, and the title was not, therefore, perfected.

VII. For a proper understanding of the next objection made by appellants, a further statement of facts is necessary.

For the purpose of settling the indebtedness of defendant Shaw to the school fund, secured by the mortgage foreclosed in this case, and like indebtedness of other parties to the same .fund, secured in a similar manner, and for acquiring the title to what is known as the " Capitol Building," the Tenth General Assembly passed an act authorizing certain commissioners to purchase the capitol building, and, in payment therefor, release all claims of the State against said parties who were indebted to the school fund on account of moneys borrowed by them through J. D. Eads, superintendent of public instruction. The capitol building was the property of a certain corporation known as the " Capitol Building Association," of which Shaw and other debtors to the school fund were stockholders and members. The money borrowed by them, for which they became debtors to the school fund, was principally used in erecting the capitol building. The title of the property was in the association.

The following are the material parts of said act, chap-

ter 94, acts (1864) of Tenth General Assembly, which relate to the question under consideration :

" § 4. Said commissioners shall be, and they are hereby, authorized to arrange with the parties interested for the purchase of the capitol building and the release of all claims against such parties, upon the following terms, viz.: When the said parties, to wit., J. A. Williamson, W. A. Scott, J. D. Cavenor, J. M. and H. H. Griffiths, Alexander Shaw and T. K. Brooks, who, on or about the 26th and 27th days of June, 1856, borrowed of the school fund of Iowa, through James D. Eads, superintendent of public instruction, certain sums of money, shall cause to be executed to the State a good and sufficient conveyance of the title, in fee simple, unincumbered, to lots 11 and 12, in block 6 of Scott's addition to Des Moines, together with the buildings thereon and appurtenances, it being the building now used by the State for a capitol, and the lots on which the same is situated, the sufficiency of which conveyance and title shall be determined by the attorney-general, and certified by his indorsement in writing thereon ; then the said commissioners shall assign, without recourse to the State in any event whatever, the several notes and mortgages given by the said parties for the said sums borrowed as aforesaid, to S. V. White, or such other person as the several parties may in writing request, for the use of the several parties interested therein : *Provided*, That the mortgage executed by W. A. Scott and Louisa Scott, dated June 27, 1856, to said James D. Eads, superintendent of public instruction, to secure the payment of eight thousand three hundred dollars ; and the mortgage executed by J. D. Cavenor, dated July 1, 1856, to said superintendent of public instruction, to secure the payment of four thousand one hundred and twenty-five dollars ; and also the mortgage executed by Alexander Shaw, dated June 27, 1856, to said James D. Eads, super-

intendent of public instruction, to secure the payment of three thousand dollars, shall not be assigned by said commissioners, but the same shall remain the property of the State; and said commissioners shall cause each of said mortgages, respectively, to be foreclosed by suit in the name and for the use of the State.

" *Provided further, however*, That the sale of block 4, in W. A. Scott's addition to Des Moines, upon special execution issued upon judgment of foreclosure of the said mortgage and note executed by said W. A. Scott, shall operate as a release and satisfaction of the claims of the State to said note and mortgage, or judgment rendered thereon, so far as the State is concerned; but such release by the State shall not in any manner be construed to operate as a satisfaction of the said note and mortgage, or judgment rendered thereon, so as to prevent the collection and enforcement of the same by the person or persons to whom assigned by the commissioners, as herein after provided; *and provided also*, that the sale of the southwest quarter of section No. 4, and the southwest quarter and south half of the northwest quarter of section No. 15, and the west fractional half of section No. 7, and the north fractional half of the northwest quarter of section No. 18, and the west half of northeast quarter of section No. 30, all in township No. 77, north of range 25, west, in Warren county and State of Iowa, containing nine hundred and fifteen and seventy-five one hundredths acres, upon special execution issued upon judgment of foreclosure of the said mortgage executed by the said J. D. Cavenor, shall operate as a full release and satisfaction of the claim of the State to said mortgage and note therein secured, or to any judgment rendered thereon; *and provided also*, that the sale of the north half of the southwest quarter of section 26, township 80, north of range 24, west, containing eighty acres, upon special exe-

cution issued upon judgment of foreclosure of said mortgage executed by the said Alexander Shaw, shall operate as a release and satisfaction of the claim of the State to said mortgage and note therein secured, or judgment rendered thereon, so far as the State is concerned; but such release by the State shall not in any manner be construed to operate as a satisfaction of the said note and mortgage, or judgment rendered thereon, so as to prevent the collection and enforcement of the same by the person or persons to whom assigned by the said commissioners, as hereinafter provided; and after such foreclosure and sales the remaining interest of the State in said notes and mortgages, respectively, and to the judgments rendered thereon, shall be assigned by said commissioners, as hereinbefore provided; and such assignment shall fully convey to such person or persons to whom assigned the said notes, mortgages and judgments rendered thereon, and the same shall be held by the party or parties to whom assigned as unsatisfied subsisting claims and liens, and may by them and each of them be held and enforced as such."

It must be rembered that the debtors to the school fund, named in the foregoing act, were not all of the original stockholders in the Capitol Building Association, and they were originally, and at the date of the passage of this act and the settlement made with them by the commissioners, unequally interested as stockholders in the association. Neither did the amount of stock held by each, and the indebtedness of each, hold the same proportion relatively as in case of the other stockholders; that is, each stockholder was not indebted to the school fund in proportion to his stock precisely as his associates; the stock and indebtedness in each case bore different proportions.

Under the foregoing law the commissioners, whose ap-

pointment is therein provided for, proceeded to carry out its provisions, and the capitol building was conveyed to the State by the association. This suit is brought by the State in pursuance of the provisions of the act above quoted.

The appellants Callanan and Ingersoll insist that the mortgage, under the foregoing state of facts, must be considered, in fact and in law, paid. It seems to us that the foregoing statement of facts, taken into consideration with the provisions of the law, is an answer to this position that refutes it without argument. The capitol building was the property of the association, an artificial person. It was conveyed to the State in payment of the debts of the parties mentioned in the above quoted law. These parties and others, as stockholders in the association, incumbrancers, creditors, etc., etc., had equities among themselves, growing out of their relation and rights in and to the association and property. As an illustration, Shaw owed $3,000 to the school fund, and owned stock to the amount of $3,000. Another stockholder may have owed but $5,000, and yet held stock to the amount of $20,000. It is clear that, upon conveying the property in payment of the debts of these individuals, equities would arise between them. As a further illustration, Shaw may have, in good faith, hypothecated or sold his stock, or a portion of it. It is equally clear that, in such a case, the holder would have an equitable claim upon the consideration received by the association for the property, which was the mortgages of Shaw and others.

Hence the law did not contemplate the satisfaction of the mortgage, but that, after foreclosure, the decree should be assigned for the benefit of the parties interested. The law plainly provides that the mortgage should not be satisfied, and the interest of the parties

may require that it should not be. The State, under the law, stands as a trustee for such parties to foreclose the mortgage.

We are not now called upon to determine who, if any one, has an interest in the mortgage and decree; or whether, in fact, the equities of all the parties concerned are not so evenly balanced that the mortgage and decree ought to be considered paid and discharged after sale of the lands. The questions growing out of this aspect of the case are not before us. The questions which we are required to determine are those affecting the right of the State to foreclose the mortgage. Under the above state of facts there can be no doubt as to that right, and, in view of the peculiar provision of the statute above quoted, it is difficult to see how a question can be made against it. It is expressly provided that the mortgage " shall remain the property of the State," and the commissioners shall cause it to be foreclosed by suit in the name and for the use of the State; that the sale of the lands thereon shall operate as a release of the interest of the State in the decree; " but such release by the State shall not in any manner be construed to operate as a satisfaction of said note and mortgage, and judgment rendered thereon, so as to prevent the collection and enforcement of the same by the person or persons to whom assigned by said commissioners as hereinafter provided; and after such foreclosure and sale, the remaining interest of the State * * to the judgments * * shall be assigned by said commissioners as hereinbefore provided, and such assignments shall convey to such person or persons to whom assigned, the said notes, mortgages and judgments rendered thereon, and the same shall be held by the party or parties to whom assigned as unsatisfied subsisting claims and liens, and may by them and each

of them be held and enforced as such." It does not seem possible to misunderstand this language.

The question whether, as between the defendants, the decree and mortgage, after the sale of the lands specified and described in the above statute, ought in equity to be canceled and satisfied is not now before us. Neither are we required to consider the evidence to determine whether Shaw did in fact and in good faith assign his stock in the association to Hussey. Indeed, none of the various questions arising between the defendants are now before us. That the mortgage must be foreclosed we have no doubt ; what are the rights of the defendants after that, will be considered in the future progress of the case, which, as to them, is still pending in the District Court The decree foreclosing the mortgage ought not, in any manner, to cut off any possible equity or right that any defendant may have to the town lots, or as against his co-defendants, or any one of them. What these rights may be we are not now called upon to determine. Whatever they may be, they must be protected. Without passing an opinion upon any question that may arise, but for the purpose of illustrating our views of what should be the effect and operation of the decree, we suggest that in case it be proved that the stock of Shaw in the association has not been assigned, or that there is no lien upon it, and that there are no equities between him and the other stockholders, then Ingersoll's claim and title under the deed of trust, and Callanan's tax titles, if found in other respects regular and sufficient, might assume very different characters and become of effect different than as above shown. In such a case, the decree of foreclosure as to the lots, so far as it affects the interest of any of the defendants (Shaw excepted), will be held satisfied, and the rights of the different defendants will be settled

by a supplemental decree to be rendered in the District Court, in the future progress of this case.

In order to protect perfectly the interests and rights of all of the defendants, including Callanan's rights, if any, to enforce his lien for taxes paid on the eighty acres, and upon the lots as part of the property liable to the whole mortgage, now laid wholly on the eighty, the decree rendered by the District Court must be modified. As it now stands it directs that, upon the sale thereon of the land described in the mortgage, the decree as to the town lots shall be assigned to the trustee named in the statute above quoted, for the benefit of the parties interested, who shall have special execution against the lots to satisfy the balance of the judgment remaining unpaid after the sale of the lands. The decree will be modified so as to suspend its assignment and execution thereon (after sale of the lands) until the final decree in the case settling the rights of all the defendants, which may, as we have above indicated, if the equities of the parties so require, direct the cancellation and satisfaction of the decree, or otherwise order its assignment, as now provided for, and that it be enforced by execution for the benefit of the parties who, in the further progress of the case, may appear entitled to such relief. This modification will not interfere with the immediate sale, under the decree, of the land, viz.: north $\frac{1}{2}$, southwest $\frac{1}{4}$, section 26, township 8, north range 24. The decree will not be modified nor its enforcement delayed as to this land.

With the modification above indicated the decree of the District Court is

Affirmed.