STATE OF IOWA EX REL. SHAVER, Appellee, v. IOWA TELEPHONE
COMPANY, Appellant.

**TELEGRAPHS AND TELEPHONES:** Franchise—Revocability—
1  **Reserve Power of State.** A telephone company which, prior to
the taking effect of the Code of 1897 (Oct. 1, 1897), erected and
operated its telephone equipment upon and along the public high-
ways of the state under authority of § 1324, Code, 1873, as amended
by Chap. 104, Acts of the 19th General Assembly, (which, without
limitation as to time, authorized it to so do), thereby created con-
tract relations between itself and the state of Iowa, and became
possessed, not of a mere revocable license, but of a special fran-
chise in perpetuity—a perpetual right to use such highways for
both long. distance and local telephone purposes—a right subject
to no limitation except the permissible exercise of (a) the *police
power* of the state and (b) the *reserve power* then existing in the
Constitution and statute laws of the state.

**CONSTITUTIONAL LAW:** Vested Rights—Perpetual Franchise—
2  **Reserved Power to Repeal—Telephones.** WHETHER the statutory
declaration that, as to corporations organized under the general in-
corporation laws of this state, "The articles of incorporation, by-
laws, rules and regulations . . . shall, at all times be sub-
ject to legislative control and may be, at any time, altered, abridged
or set aside by law, and every franchise obtained, used or enjoyed
. . . may be regulated, withheld or be subject to conditions
imposed upon the enjoyment thereof, whenever the General As-
sembly shall deem necessary" (§ 1090, Code, 1873; § 1619, Code,
1897), and WHETHER the constitutional power of the General As-
sembly "to amend or repeal all laws for the organization or cre-
ation of corporations, or granting of special or exclusive privileges
or immunities : . . and no exclusive privileges, except as in
this article provided, shall ever be granted" (§ 12, Art. 8, Const.),
CONSTITUTES A RESERVATION OF POWER SO BROAD AND COMPREHENSIVE
AS TO CONSTITUTIONALLY JUSTIFY the legislature not only in taking
away at pleasure the *corporate* franchise of an Iowa corporation,
but also in depriving it of all *special* franchises (for instance, of a
previously granted perpetual right to use public highways for a
public utility purpose) without compensation, or without other-
wise protecting property rights acquired, *quaere.*

**STATUTES:** Construction—Direct Legislative Grant in Perpetuity—
3  **Non-Repeal by Subsequent Statutes—Telephones.** The special

franchise in perpetuity to use the public highways for telephone purposes, acquired under specific authority of § 1324, Code, 1873, as amended by Chap. 104, Acts of the 19th General Assembly, was, irrespective of any "reserved power" in the state, NOT FORFEITED OR INTENDED TO BE FORFEITED by the enactment of any of the following statutes, to wit:

1. Chap. 16, Acts 22d G. A. (April 10, 1888), which provided: "Cities shall have power to *regulate* . . . telephone . . . wires and provide the manner in which, and places where, the same shall be placed upon, along or under the streets and alleys of such city."

2. § 775, Code, 1897 (being a substitute amendment of said Chap. 16, Acts 22d G. A.), which provided: "Cities . . . shall have the power to *authorize* and *regulate* . . . telephone . . . wires and the poles and other supports thereof, by general and uniform regulation and to provide the manner in which, and places where, the same shall be placed upon, along or under the streets . . . of such city . . . and may divide the city into districts for that purpose."

3. § 776, Code, 1897, which provided: "No franchise shall be granted, renewed or extended by any city . . . for the use of its . . . highways . . . for any" telephone purpose, except on vote of the electors of the city.

*Held,* further, (a) the *regulatory* features of these three statutes applied to *all* special telephone franchises (the right to use the public highways, as distinguished from a *corporate* franchise), howsoever or whensoever obtained, but (b) the *authorization* features—the power of the city to grant such special franchise—had no application to such a franchise already possessed under direct legislative authority from the state, to wit, § 1324. Code, 1873.

WEAVER and PRESTON, JJ., dissent.

**STATUTES:** Construction—Forfeiture—Prospective or Retrospective Operation—Implied Repeals—Telephone Franchises. Three cardinal principles of statutory construction are:

1. Forfeitures are in disfavor. A statute which is relied on as forfeiting an acquired right (assuming the right to declare such forfeiture) must be so clear as to remove all reasonable doubt as to the legislative intent.

2. A statute, in the absence of an unequivocal intent to the contrary, will be construed prospectively and not retrospectively.

3. Repeals by implication are not favored. So held and applied where it was claimed that a special telephone franchise, acquired under direct statutory grant from the state, had been repealed and forfeited by subsequent statutes enacted under color of certain powers reserved by the state in its Constitution and statutes.

WEAVER and PRESTON, JJ., dissent as to the application made of said principles.

MUNICIPAL CORPORATIONS:     Governmental Powers—Telephone Toll Lines—Regulation.     Whether cities and towns, in view of §§ 775, 776, and 2158, Code, 1897, have power to regulate telephone *toll* lines within their limits, *quaere.*

*Appeal from Polk District Court.*—C. A. DUDLEY, Judge.

MONDAY, NOVEMBER 1, 1915.

REHEARING DENIED FRIDAY, APRIL 7, 1916.

ACTION to oust defendant company from the streets and highways of the city of Des Moines, because the defendant is without a franchise to operate its local telephone system and exchange in the city, for that the company has not obtained the consent of the city and the electors thereof to use its streets, highways, avenues, alleys and public places, as required by the statutes on the subject. Defendant contends that such consent is not required. A number of defenses were interposed. The demurrer of plaintiff to defendant's answer was sustained. Defendant was found guilty of operating and maintaining a local telephone exchange, and of occupying the streets, avenues, etc., of the city, without lawful authority. A judgment was entered accordingly. Defendant appeals. *Reversed* and *Remanded.*

*Parker, Parrish & Miller,* for appellant.

*H. W. Byers, E. C. Carlson,* and *E. N. Steer,* for appellee.

DEEMER, J.—It is charged and admitted that the city of Des Moines is a city of the first class. Defendant is a corporation for pecuniary profit, organized in August, 1896, under the laws of Iowa. Its articles of incorporation provide, among other things:

The general nature of the business to be transacted by this corporation shall be the acquiring by purchase, lease or

otherwise, constructing, maintaining and operating telephone plants, both local and long distance, including telephone exchange systems and public and private telephones and telegraph lines. The amount of the authorized capital stock of this corporation shall be the sum of $10,000,000.

The telephone plant of defendant includes 40 exchanges, located in 32 counties within the state of Iowa, including an exchange in the city of Des Moines, and 8,998 miles of poles, upon which are carried long distance or toll lines, extending through 91 counties in Iowa; its subscribers number 65,000; it affords connections with more than 326,000 connecting stations, being approximately 96 per cent. of the 340,000 telephones within the state of Iowa. Each of defendant's telephones within the city of Des Moines, Iowa, is connected with its long distance wires, and each of said telephones may be and is used for the purpose of communication with points outside of the city of Des Moines. Defendant's telephone lines in the state of Iowa are connected with telephone lines in states other than the state of Iowa, and communication may be had by telephone as far east as New York and as far west as the city of Denver.

The Central Union Telephone Company was, in the year 1881, a foreign corporation, organized under the laws of Illinois, and continued such from 1881 to 1896, with its principal place of business in the city of Chicago. On or about the year 1881, the said Central Union Company, in pursuance of the power and authority granted by Section 1324 of the Code of Iowa of 1873, as amended by Chapter 104, Acts of the Nineteenth General Assembly, commenced to acquire, construct, maintain and operate telephone lines in Iowa, and so continued until about September, 1896; between the years 1881 and 1896, said Central Union Company operated telephone lines extending from Des Moines to Davenport, from Davenport to Burlington, and from Burlington to Keokuk, and from each of said cities to other cities and towns in Iowa; said Central Union Company furnished the public means of

communication by telephone between the cities and towns through and to which its said telephone lines extended, also to the inhabitants of each of said cities and other cities in Iowa, by means of local communication by telephone with the other inhabitants of each of said cities and towns; for the purpose of furnishing said communication, said Central Union Company, during said years, operated in each of the cities before named, and in other cities in the state of Iowa, what were known as local exchanges, by means of which the inhabitants of each of said cities who desired telephone service secured connection with the local exchange, through which they could communicate by telephone with other telephone patrons in the same city and with persons in other cities and towns; the lines and apparatus were used by patrons for communication between all of said cities and towns, as well as local communication. In acquiring, constructing, maintaining and operating its said telephone system, the said Central Union Company occupied the streets, avenues, alleys and other public places of the cities before mentioned, and cities and towns through and to which its lines extended, as well as the country highways connecting said cities and towns, with its poles, wires and other apparatus.

The defendant contends that the said Central Union Company acquired, possessed and owned the right to occupy in perpetuity the streets, avenues, alleys and other public places in the city of Des Moines, as well as in the other cities and towns through and to which its line extended, and the country highways connecting said cities and towns, with its poles, wires and other apparatus, for the purpose of carrying on a telephone business and furnishing to the public means of communication between said cities and towns, as well as local communication between the inhabitants of each of said cities and towns. About September, 1896, the said Central Union Telephone Company, for a valuable consideration, sold, assigned and transferred to this defendant all its telephone property in Iowa. Defendant contends that such transfer includes the

right to occupy in perpetuity the streets, avenues, etc., in all the cities named, and other cities and towns in the state in which it was then operating telephone lines, as well as the country highways extending between said cities and towns, with its poles, wires, etc., for the purpose of carrying on a telephone business. About the date last named, defendant took possession of said telephone property and has since owned and operated the same, and occupied and is now occupying the streets, avenues, etc., of all said cities and towns, and the said country highways, and it has used the streets, highways, etc., for the purpose of carrying on both long distance and local telephone communication.

Section 2158 of the statute, which is the same as Section 1324 of the Code of 1873, was in force when the Central Union Company was organized, except that in 1882, by Chapter 104 of the Acts of the Nineteenth General Assembly, the words "or telephone," in the third line of Section 2158, were added. The Central Union Telephone Company was incorporated in 1881, so that its franchise, in the sense that it had a right to exist and transact business under its articles of incorporation, would date from 1881; but in the sense that it had a franchise, or the right to use the streets, highways, etc., under the grant from the state, it is not so clear from the allegations of the answer that the company commenced to occupy the streets before the amendment of 1882 to Section 2158 of the Code. The allegations are:

"That on or about the year 1881, the said Central Union Telephone Company, in pursuance of the power and authority granted by Section 1324 of the Code of Iowa of 1873, as amended by Chapter 104 of the Acts of the Nineteenth General Assembly, commenced to acquire, construct, maintain and operate," etc.

Section 1619 of the present Code is substantially the same as Section 1090 of the Code of 1873; the effect of the change will be hereafter noted. The defendant has not obtained the consent of the city of Des Moines or the electors therein to

occupy the streets, highways, etc., for its local exchange or system in the city, as required by other sections of the statute subsequently enacted; and it contends that it is not required to do so, because it obtained its authority from the state under prior statutes, and that, by accepting its franchise or right to use the streets, a contract obligation was created, which the legislature has no power to change.

Plaintiff contends that the power which had been reserved under the Constitution and the earlier statutes has been exercised by the enactment of Sections 775 and 776 of the Code of 1897; and that, before defendant may occupy the streets and other places in the city with its wires, poles and other supports, the defendant must obtain the consent of the city and its electors.

II.   As already indicated, defendant contends that:   (a) A direct grant by the legislature to a public utility corporation to erect its plant upon the highways of the state, upon acceptance by a corporation coming within the terms of the grant, by the erection and operation of its plant, involving an expenditure of money, constitutes a contract between the state and such corporation which, in the absence of reserved power in the legislature in effect at the date of the grant, cannot be impaired by subsequent legislation; (b) any legislation purporting to repeal or impair such grant is in violation of Section 10 of Article I of the Constitution of the United States and Section 1 of Article XIV of the Amendments to that Constitution, and also in violation of Sections 1 and 21 of Article I of the Constitution of the state of Iowa; (c) neither by Section 12 of Article 8 of the Constitution of Iowa nor by Section 1090 of the Code of 1873 (Section 1619 of the Code of 1897) has power been reserved in the legislature to repeal a legislative grant, under the circumstances set forth. Even if the legislature has reserved the power to repeal the grant to telephone companies, under the provisions of Section 1324 of the Code of 1873, as amended, no such right has been

1. TELEGRAPHS AND TELE-PHONES: franchise: revocability: reserve power of state.

in fact exercised by the enactment of Sections 775 and 776 of the Code of 1897.

These contentions present the main propositions in the case. At the outset, it must be conceded that, under our previous holdings, the defendant, in virtue of Section 1324 of the Code of 1873, as amended by Chapter 104 of the Acts of the Nineteenth General Assembly, acquired the right to occupy the streets and alleys of the city of Des Moines with its poles and wires, for the purpose of conducting a telephone business. *Chamberlain v. Telephone Co.*, 119 Iowa 619; *State v. Nebraska Telephone Co.*, 127 Iowa 194.

In the *Chamberlain* case, *supra,* it is said:

"Whatever rights telegraph companies were given by the original act were conferred upon telephone companies by Chapter 104 of the Laws of the Nineteenth General Assembly. It matters not whether telegraph companies made a limited use of the streets and alleys of cities or not. They were not so limited by the law, and this was well known. It was also known by all that the principal business of telephone companies was confined to urban ways. True, they had then used rural ways, to a limited extent, and it may have been apparent to the legislature that the rural service would be extended, and the long distance phone finally become one of the great public conveniences and necessities which it now is. But notwithstanding this, they were given the use of highways and streets without limitation, and without control by city authorities. If the legislature had intended to limit their use of the streets to long distance service, it would doubtless have done so by the use of apt words. That such was not its intention is further manifest from the fact that, prior to the amendatory act in question, this court had practically held that the words 'telegraph companies,' as used in the statute, included 'telephone companies.'"

In the *Nebraska Telephone Co.* case, *supra,* we said:

"Section 1324 of the Code of 1873, as amended by Chapter 104, page 100, of the Laws of the Nineteenth General

Assembly, gave to any person or company the right to construct a telegraph or telephone line along the public highways of the state; and, under the authority so given, the defendant had the right to occupy the streets and alleys of the city, as well as the rural highways or roads. *Chamberlain v. Iowa Telephone Co.*, 119 Iowa 619; *State v. City of Red Lodge* (Mont.), 76 Pac. 758. In the Code of 1897, the words 'public roads' are used in the place of the words 'public highways,' used in the former statutes; and, as we understand the appellant's argument, it is claimed that the change limits the defendant's right in the streets of the city to those actually occupied by it prior thereto. Whether the change was intended to distinguish between streets and rural ways, we need not determine; for whatever the intent as to that, it is apparent that the change was not intended to, and does not, limit or affect the right of those who accepted and acted upon the grant given by the former statutes. The grant to use the streets was without limitation as to territory, and under its authority, there can be no question as to the right to extend the service to meet the demands of the public. The very nature of the business demands the use of many streets, and may demand the use of every street in the city; and this was doubtless contemplated by the legislature when the unlimited grant was made. *Chamberlain v. Telephone Co., supra; Duluth v. Duluth Telephone Co.*, 84 Minn. 486 (87 N. W. 1127). True it is that the acceptance of the grant may limit its operation; but, in the absence of an acceptance which does so, it must be presumed, from the nature of the business and the preparation made therefor, that the acceptance of the grant and the privileges thereunder was as broad as the grant itself, and included the right to extend the service as required by public necessity. *Duluth v. Duluth T. Co., supra; Michigan Telephone Co. v. City of Benton Harbor,* 121 Mich. 512 (80 N. W. 386, 47 L. R. A. 104).''

While these holdings are challenged, and we are asked to recede therefrom, a re-examination of the question in the

light of the arguments now made confirms us in the conclusion that they are right, and that they are amply fortified by a long line of decisions rendered both before and after their pronouncement.    See *City of Duluth v. Duluth Tel. Co.* (Minn.), 87 N. W. 1127; *Wisconsin Tel. Co. v. Oshkosh* (Wis.), 21 N. W. 828; *State v. Central New Jersey Telephone Co.* (N. J.), 21 Atl. 460; *State v. Milwaukee* (Wis.), 113 N. W. 40; *Michigan Tel. Co. v. City of Benton Harbor* (Mich.), 80 N. W. 386; *City of Wichita v. Missouri & K. Tel. Co.* (Kas.), 78 Pac. 886; *City v. Southwestern Telegraph & Telephone Co.* (Tex.), 106 S. W. 915, 917; *State v. City of Red Lodge* (Mont.), 76 Pac. 758; *City v. Old Colony Trust Co.*, 132 Fed. 641.    That this statute, as amended, constituted a grant to the telephone company, which, upon acceptance, became a contract between the state and the telephone company, is also well settled by authority.    *Russell v. Sebastian*, 233 U. S. 195; *New York Line v. Empire Subway Co.*, 235 U. S. 179; *Walla Walla v. Walla Walla Co.*, 172 U. S. 1, 19; *City of Owensboro v. Cumberland Tel. & Tel. Co.*, 230 U. S. 58.

At the time the defendant accepted the grant, neither the city of Des Moines nor any other municipality in the state had power to grant a franchise to any telegraph or telephone company to occupy or use any of its streets or alleys.    This was a power which the legislature, the seat of all authority in the matter down to that time, reserved to itself; although it may be granted that, in the exercise of its police power, the city, before any authority was given it, as well as after it had been given, might exercise such power in a regulatory manner.    The original grant by the legislature, being unlimited as to time, gave to whoever might accept the grant a special franchise in perpetuity, subject only to a proper exercise of the police power and to any expressly reserved power.    *City of Louisville v. Cumberland Co.*, 224 U. S. 649; *Detroit v. Detroit R. Co.*, 184 U. S. 368; *Owensboro v. Cumberland Tel. Co.*, 230 U. S. 58; *Town of New Decatur v. American Tel. & Tel. Co.* (Ala.), 58 So. 613; *Blair v. Chicago*, 201 U. S. 400; *City of*

*Seattle v. Columbia & P. S. R. Co.* (Wash.), 33 Pac. 1048; *Suburban Electric Co. v. East Orange* (N. J.), 41 Atl. 865.

In the *Owensboro* case, *supra,* the court said:

"That an ordinance granting the right to place and maintain upon the streets of a city poles and wires of such a company is the granting of a property right has been too many times decided by this court to need more than a reference to some of the later cases  .  .  .  As a property right, it was assignable, taxable and alienable. Generally, it is an asset of great value to such utility companies, and a principal basis for credit. The grant by ordinance to an incorporated telephone company, its successors and assigns, of the right to occupy the streets and alleys of a city with its poles and wires for the necessary conduct of a public telephone business, is a grant of a property right in perpetuity, unless limited in duration by the grant itself, or as a consequence of some limitation imposed by the general law of the state, or by the corporate powers of the city making the grant.  .  .  .  If there be authority to make the grant, and it contains no limitation or qualification as to duration, the plainest principles of justice and right demand that it shall not be cut down, in the absence of some controlling principle of public policy. This conclusion finds support from a consideration of the public and permanent character of the business such companies conduct, and the large investment which is generally contemplated. If the grant be accepted and the contemplated expenditure made, the right cannot be destroyed by legislative enactment or city ordinance based upon legislative power, without violating the prohibitions placed in the Constitution for the protection of property rights. To quote from a most weighty writer upon municipal corporations, in approving of the decision in *People v. O'Brien, supra,* a decision accepted and approved by this court in *Detroit v. Detroit Street Railway, supra,* 'The grant to the railway company may or may not have been improvident on the part of the municipality, but having been made, and the rights of innocent investors and of third parties as creditors

and otherwise having intervened, it would have been a denial
of justice to have refused to give effect to the franchise accord-
ing to its tenor and import, when fairly construed, particularly
when the construction adopted by the court was in accord with
the general understanding.   In the absence of language
expressly limiting the estate or right of the company, we think
the court correctly held, under the legislation and facts, that
the right created by the grant of the franchise was perpetual,
and not for a limited term only.' Dillon on Mun. Corp. (5th
Ed.), Sec. 1265.''

In the *Seattle* case, we find this language:

''Property rights acquired under and by virtue of a
franchise thus granted are perpetual, unless otherwise limited
in the grant; and there was no limit in this instance, and such
franchises are not void in consequence thereof.   There is no
sound reason why a municipal corporation may not bind itself
in this particular, as well as an individual may.   On the con-
trary, well recognized principles of justice require that it
should be so bound, to the end that property rights may be
made stable and certain, and the municipality is sufficiently
protected under such circumstances; for should it become
necessary to thereafter undo the work and terminate the rights
granted, and to take the property of the corporation acquired
in pursuance and by virtue thereof, it may do so under the
exercise of the power of eminent domain upon making com-
pensation; and this is a sufficient protection for the rights
of the city, and one which, at the same time, affords protec-
tion to the rights of the respondents.''

That the legislature granted a special franchise to the
defendant, rather than a mere revocable license, should, we
think, be conceded; but that this grant was at all times sub-
ject to regulation and control, either by the city or the state,
in the proper exercise of the police power, should also be con-
ceded; for neither could bargain away this power, and all
property, whether held by a person or corporation, is subject
at all times to regulation and control under the police power,

and at times subject even to destruction under this power.
It is also subject to taxation, and to the right of the state to
take it, in the exercise of the power of eminent domain.

A corporation itself, under the reserved power found in
the Constitution, to which we shall hereafter refer, is not only
subject to regulation, but its charter, which is its very life,
may be repealed at the discretion of the legis-
2. CONSTITU-
    TIONAL LAW: lature. If, in this connection, it be conceded
    vested rights:
    perpetual fran- that the acts which it is claimed forfeited
    chise: reserved
    power to repeal: defendant's rights were not in the exercise of
    telephones.
the police power of either the state or the city,
what was done must be said to have been in the exercise of
the reserved power of the state; and reliance is placed upon
Sec. 1090 of the Code of 1873 (Sec. 1619 of the Code of 1897),
and Sec. 12 of Article 8 of the Constitution. The former reads
as follows:

"The articles of incorporation, by-laws, rules and regula-
tions of corporations hereafter organized under the provisions
of this title, or whose organization may be adopted or amended
hereunder, shall at all times be subject to legislative control
and may be at any time altered, abridged, or set aside by law,
and every franchise obtained, used or enjoyed by such cor-
poration, may be regulated, withheld, or be subject to condi-
tions imposed upon the enjoyment thereof, whenever the gen-
eral assembly shall deem necessary for public good."

The constitutional provision reads:

"Subject to the provisions of this article, the general
assembly shall have power to amend or repeal all laws for the
organization or creation of corporations, or granting of special
or exclusive privileges or immunities . . . ; and no exclusive
privileges, except as in this article provided, shall ever be
granted."

Counsel for plaintiff make the broad claim that, under the
power reserved in these written laws, which were in force
when defendant took advantage of the legislative grant, the
legislature not only had the right to amend or repeal all laws

for the organization or creation of corporations,—that is, to take away at pleasure their corporate franchises,—but also had plenary power to deprive them of all special franchises or grants, without making compensation or otherwise protecting their property rights acquired under such grants. On the other hand, it is contended for the defendant that this reserved power, assuming it to be as broad as contended for by plaintiff, must be limited to the corporate charter, or the right to do business at all; and as applied to special franchises, such as the right to use streets and alleys with poles and wires, this reserved power is subject to other Federal constitutional provisions, such as that the obligations of contracts shall not be impaired, or anyone deprived of his property without due process of law. Exhaustive and learned arguments are made in support of each of these contentions, but it is manifest that, unless we find that the legislature did in fact attempt to deprive defendant of its grant, and to forfeit its franchises or privileges to use the streets and alleys of the city, the questions presented are moot ones, which we should not decide before they actually arise.

This brings us down to what we regard as the crucial point in the case: Did the legislature attempt to deprive the defendant of rights theretofore given it under the statute with its amendment? The original statute, as amended, reads as follows:

3. STATUTES: construction: direct legislative grant in perpetuity: non-repeal by subsequent statutes: telephones.

"Any person or company may construct a telegraph or telephone line along the public highways of this state or across the rivers or over any lands belonging to the state or to any private individual, and may erect the necessary fixtures therefor; provided that when any highway along which said line has been constructed shall be changed, said person or company shall, upon ninety days' notice in writing, remove said line to said highway as established. Said notice contemplated herein may be served on any agent or operator in the employ

of said person or company." McClain's Code of 1888, Sec. 2103.

This is the statute which was construed in the *Chamberlain* and *Nebraska Telephone* cases, *supra*. The act which it is claimed deprived defendant of its rights to use the streets and alleys is Chapter 16, Acts of the Twenty-second General Assembly, passed in the year 1888, reading as follows:

Cities shall have power "to regulate telegraph, telephone, electric light, district telegraph and other electric wires, and provide the manner in which and places where the same shall be placed upon, along or under the streets and alleys of such city."

This was amended by the legislature which passed the Code of 1897, so as to make it read as follows:

"Cities and towns shall have the power to authorize and regulate telegraph, district telegraph, telephone, street railway and other electric wires, and the poles and other supports thereof, by general and uniform regulation, and to provide the manner in which, and places where, the same shall be placed upon, along or under the streets, roads, avenues, alleys and public places of such city or town, and may divide the city into districts for that purpose." Sec. 775, Code, 1897.

The same legislature passed what is known as Section 776 of the Code of 1897, reading as follows:

"No franchise shall be granted, renewed or extended by any city or town for the use of its streets, highways, avenues, alleys or public places, for any of the purposes named in the preceding section, unless a majority of the legal electors voting thereon vote in favor of the same at a general or special election. The council may order the question of granting, renewal or extension of any franchise submitted to a vote at a general election, or at one specially called for that purpose; or the mayor shall submit said question to such vote upon the petition of twenty-five property owners of each ward in a city, or fifty property owners in any incorporated town."

This last quoted section has been amended by the thirty-second and thirty-third general assemblies, but these amend-

ments are not material to this controversy. No change was made in what was theretofore known as Section 1324 of the Code, as amended by the nineteenth general assembly, except to substitute for the words "public highways" and "highways," the words "public roads" and "roads."

The Code Commission, in recommending the change found in Section 775 of the Code of 1897, makes this report:

"In order to include poles as well as wires, and street railway, as well as other electric wires, also to require regulations to be uniform and impartial, this section as reported should be changed to read as follows: 'Cities and towns shall have the power to authorize and regulate telegraph, district telegraph, telephone, street railway, and other electric wires, and the poles and other supports thereof by general and uniform regulation, and to provide the manner in which and places where the same shall be placed upon, along, or under the streets, roads, avenues, alleys, and public places of such city or town, and may divide the city or town into districts for that purpose.'"

Section 776 seems to have emanated from the legislature itself, and the referendum vote therein referred to was new. Theretofore, the only public utilities subject to such a vote were water and gas works, electric light and electric power plants. The change made in Section 1324 of the Code of 1873 was manifestly to harmonize it with the statutes just quoted, with reference to the powers of cities and towns over telephone and telegraph companies.

Now, the primary question in the case is whether or not, by the enactment of these laws, commencing with the acts passed in the year 1888 and ending with those appearing in the Code of 1897, the legislature intended to forfeit rights already acquired by a telephone company under Section 1324 of the Code of 1873, as amended by the Acts of the Nineteenth General Assembly, and to require such a company, already occupying the streets and

**4. STATUTES: construction: forfeiture: prospective or retrospective operation: implied repeals: telephone franchises.**

alleys of a city, to secure, through action of the city council and by a referendum vote, the right to use the streets and alleys upon which it had already placed its poles and lines, under specific authority from the legislature. Or was it the intent of the legislature to authorize cities to regulate such companies as were already using the streets and alleys under grant of the legislature, and all others which might secure the right to so use the streets and alleys, by general and uniform legislation applicable to all, and to further provide that no franchise to use the streets and alleys should thereafter be granted, renewed or extended, except upon a referendum vote of the people? It seems clear to us that the latter is the proper interpretation to be put upon these laws. It must be remembered that the franchise spoken of is not the general franchise of a corporation, domestic or otherwise, granted by a sovereign, but a franchise for the use of the streets, alleys, etc., of the city. The latter, the defendant had directly from the legislature; and, as we have seen, it was perpetual in character, subject to forfeiture, if at all, only by the legislatur itself. It did not need to be renewed or extended, and as i had one already, no further grant was necessary.

Several well-settled rules are to be considered, in determining this main proposition: First, forfeitures are not favored, and legislative enactments of that character are strictly construed. *In re Kuhn's Estate,* 125 Iowa 449; *Salters v. Tobias,* 3 Paige Ch. (N. Y.) 338; *Smith v. Spooner,* 3 Pick. (Mass.) 229; *Sullivan v. Park,* 33 Me. 438; *Russell v. University,* 1 Wheat. (U. S.) 432; Endlich on Interpretation of Statutes, Sec. 343. Again, repeals by implication are not favored. Endlich on Interpretation of Statutes, Sec. 210; *Casey v. Harned,* 5 Iowa 1; *Burke v. Jeffries,* 20 Iowa 145; *Lambe v. McCormick,* 116 Iowa 169; *Diver v. Keokuk Savings Bank,* 126 Iowa 691. Another well-settled canon of construction is that statutes should be construed prospectively, and not retrospectively; and this is true although there be no constitutional impediment. *State v. Hays,* 52 Mo. 578; *Smith v. Humphrey,* 20

Mich. 398; *Furney v. Ackerman*, 21 Wis. 268; *Forsyth v. Ripley*, 2 G. Greene 181; *City of Davenport v. D. & St. P. R. Co.*, 37 Iowa 624; *Kennedy v. Des Moines*, 84 Iowa 187; *Farmers Co. v. Iowa State Ins. Co.*, 112 Iowa 608; *Galusha v. Wendt*, 114 Iowa 597; *Davis v. O'Ferrall*, 4 G. Greene 168; *Rosier v. Hale*, 10 Iowa 470; *Bartruff v. Remey*, 15 Iowa 257; *Purczell v. Smidt*, 21 Iowa 540; *Payne v. Chicago, R. I. & P. R. Co.*, 44 Iowa 236.

In the *Davenport* case, *supra*, it is said:

"It is also a well-established rule of the courts to construe all statutes as having only a prospective operation, unless the legislature expressly declare, or otherwise show a clear intent that it shall have a retroactive effect."

And in the *Galusha* case, it is said:

"There can be no controversy about the proposition that the court will construe a statute as prospective only, in the absence of language indicating an intention that it shall be retrospective."

In *Cameron v. United States*, 231 U. S. 710, it is said:

"A retrospective operation of statutes is not to be given except in clear cases, unequivocally evidencing the legislative intent to that effect. *Union Pacific R. Co. v. Laramie Stock Yards Co.*, 231 U. S. 190, 199, and previous cases. . . . *Summers v. United States*, 231 U. S. 92. In the absence of a clearly expressed legislative intent to the contrary, the court will presume that the law-making power is acting for the future, and does not intend to impair obligations incurred or rights relied upon in the past conduct of men when other legislation was in force. *White v. United States*, 191 U. S. 545, 552."

Turning again to Sections 775 and 776 of the Code of 1897, and considering the language used, in the light of these rules, it is apparent, we think, that the legislature did not intend to, nor did it in fact, forfeit the defendant's grant, or franchise, acquired under Section 1324 of the Code of 1873, as amended. There is no declaration of forfeiture; and a repeal

of this section, as amended, so as to affect companies which have vested rights thereunder, is not to be implied. Moreover, there is nothing to indicate that it is to affect companies already having rights upon the streets and alleys of the city, save in a regulatory manner. Section 775 clearly has reference to the regulation of telephone, telegraph, street railway and other electric wires, poles and other supports, by general and uniform rules, and it also provides that, for this purpose, the city may be divided into districts. At the time of the passage of that act, there were many street railways operating under charters from the city, and many telegraph lines running through the cities of the state. Surely, this statute did not affect the rights of such companies to use the streets of a city; and it is clear that their franchises then in existence were not forfeited thereby. The intent of the law was manifestly to give the city power, not only to authorize companies having no franchises, but also those which did, to use the streets and alleys for poles, wires, etc., under general and uniform regulations, and this it might do by dividing the city into districts. This undoubtedly had reference to the placing of the poles, supports and wires upon the property of the city, and doubtless included the right to compel telegraph and telephone companies already established to place their wires in underground conduits or in alleys, rather than in streets. The fact that the regulations must be general and uniform, at least by districts, is a clear intimation that they were not intended to apply to the granting of franchises or the right to occupy the streets and alleys. No city could, under this section, grant such a franchise, for the plain reason that the next section prohibits it, except upon a referendum vote. There is no provision in this latter section that all franchises or grants to new companies shall be uniform in their terms. Uniformity is only required in the matter of placing poles, wires and supports upon the streets, alleys and public places. If this be not the correct construction, then all franchises or grants to street

railway, telegraph and telephone companies must be general and uniform. Surely, the legislature did not intend to so tie the hands of the city authorities that they could not bargain for better terms, after once granting a franchise for the use of streets for the purpose mentioned. Moreover, giving the term "authorize" its broadest significance, there is nothing to indicate that it was to have other than a prospective operation. If a company was already authorized to use the streets and alleys of a city by legislative grant, it needed no authorization from the city; and the word itself suggests prior lack of authority. It does not, when standing alone, refer to the past or to the present, but to the future. One already authorized to do a thing needs no further authority. It is the one who does not possess it who needs the grant. Having the grant, the word "authorize" does not suggest that it be taken away. Given a prospective operation, as we think it should be, it has reference to the regulation of those companies which might then have, or thereafter be given, the right to occupy the streets; and the fundamental thought is regulation in the method of placing wires, poles, etc., upon the city streets, alleys, and public grounds. The next section clearly indicates that companies already having a franchise or grant need not secure a new one; for it says in terms that no franchise shall be granted, renewed or extended, etc., for any of the purposes named in the preceding section, without a vote of the people. This means that no such franchise shall in the future be granted, renewed or extended without a vote of the people. Unless, then, defendant's franchise, acquired under general legislative grant, was forfeited by Section 775 or by some other act, it needed no other; for it had one which, as we have seen, was perpetual, and subject only to the powers already enumerated. Its franchise did not have to be renewed or extended, in order to give it life. Under the doctrine of the *Chamberlain* and *Nebraska* cases, *supra,* the defendant had a franchise to use the streets and alleys of the city of Des Moines, and it has it yet, unless the legislature has caused the

forfeiture of the same. As forfeitures are not favored, any act which is relied upon as taking away a franchise must be so clear as to remove all reasonable doubt as to the legislative intent. There was no repeal of the statute which granted the franchise. True, it was amended, but this amendment was prospective in its operation, and at best was intended to have application to the future only. The most that can be claimed for the amendment of what was Section 1324 is that, after the passage of the amendment, cities and towns should have the right to authorize and regulate telephone, telegraph and street railway and other electric poles, wires and supports, etc., within their limits.

There may be some doubt, in construing Sections 775, 776, and 2158 together, whether cities and towns may now regulate toll lines within their limits. It may be that the state still retains its right to do this, under Section 2158.

5. MUNICIPAL COR-
PORATIONS:
governmental
powers: tele-
phone toll lines:
regulation.

Perhaps no grant from the city is necessary to obtain the right to erect a toll line within the limits of the city; and it may be that, after obtaining a grant from the state, the city may still regulate the placing of the poles, wires, etc., for toll lines within its limits, by general and uniform regulation applying to all toll lines alike. Upon this and other propositions, we express no opinion, as it is not necessary to a decision of the case.

Plaintiff relies upon the recent cases of *East Boyer Telephone Co. v. Incorporated Town of Vail*, 166 Iowa 226, and *Farmers Telephone Co. v. Washta*, 157 Iowa 447. But in neither of these cases had the telephone company acquired a franchise prior to the enactment of Sections 775 and 776, or the amendment to Section 1324 of the Code of 1873 by the Code of 1897. In neither case did the telephone company involved have any right in the streets of the respective towns under Section 1324 of the Code of 1873, as amended by the Acts of the Nineteenth General Assembly. Sections 775 and 776 were, in these cases, given a prospective operation, as they

should have been; and no such questions arose in those cases as are here involved.

Lastly, it is contended that, at most, all that defendant is entitled to is the right to maintain its toll lines within the city, and that it has not, and never had, the right from the legislature to maintain a local exchange within the city of Des Moines. This proposition is predicated upon the thought that, under Section 1324 of the Code of 1873, as amended by the nineteenth general assembly, the legislature gave defendant no other right than to construct and maintain toll lines upon the public highway of the state, which included streets and alleys, and that there was no provision for the maintenance of local exchanges until the adoption of the Code of 1897, which contains Sections 775 and 776 practically as they now stand. Some support for this contention is claimed to be found in *City of Brownwood v. Brown Telephone & Telegraph Co.* (Tex.), 157 S. W. 1163, and *Athens Co. v. Athens* (Tex.), 163 S. W. 371. As we read these, neither is in point. In each, the law was substantially the same as that found in the Code of 1897, to which we have referred, and towns were given substantially the same rights as found in Section 775 of the Code. From the *Brownwood* case, we quote the following:

"It will be observed that the grant to such corporations by Article 1231 is qualified by this important language: 'In such manner as not to incommode the public in the use of such road, streets and waters.' The effect of the limiting clause 'is to declare the right of the public to be superior to the rights granted to the corporation. Article 1235, Revised Statutes, 1911, reads: 'The corporate authorities of any city, town or village through which the line of any telegraph corporation is to pass may, by ordinance or otherwise, specify where the posts, piers or abutments shall be located, the kind of posts that shall be used, the height at which the wires shall be run; and such company shall be governed by the regulations thus prescribed; and, after the erection of said telegraph lines, the corporate authorities of any city, town or village

shall have power to direct any alteration in the erection or location of said posts, piers or abutments, and also in the height at which the wires shall run, having first given such company or its agents opportunity to be heard in regard to such alteration.' It is apparent that the right of the telephone company to pass through the city or town, over and upon its streets, is absolute, and a city has no authority to deny that right. The interest of the public in convenient service by such means of communication is the basis of the grant, and is superior to any private interest. On the other hand, the interest of the city in the manner in which the corporation exercises its right is the foundation of the authority vested in the city to control the occupancy and use of the streets by such corporations, and a reasonable exercise of the power is equally absolute. The limitation embodied in the grant to the corporation would alone be sufficient to subject it to a reasonable restraint. But the grant to the authorities of the city by Article 1235 invests the municipal government with power to enforce any reasonable regulations as to the use of the streets by the city, but such city cannot use its power to regulate in such manner as to deny the corporation the right to pass through the town, and in so doing, to use the streets in 'such way as not to incommode the public.' . . . But the city had no authority to require the telephone company to accept its ordinances as a condition precedent to entering the city. The right and duty of the city was to enforce such ordinances as prescribed reasonable regulations, whether acceptable to the telephone company or not. . . . The telephone company will be authorized to construct its line over the streets of the city, under and in accordance with the reasonable requirements of the city. The effect of the injunction will not be to take from the city its right of control over its streets, sidewalks,—in fact, all public places in the city. The telephone company is entitled to all the privileges necessary to its construction and operation as a 'distance telephone.' But it is not to be inferred from this opinion that

this company can, without consent of the city, transact the business of a local company. Our conclusions have been reached by applying to the long distance telephone the rules of law which would be applicable to the telegraph line under similar conditions, and we expressly reserve from any implication the relative rights of local telephone companies and city governments. Nor do we intend to imply any limitation upon the authority of a city in the regulation of placing of poles, etc., or placing wires underground, when necessary to avoid 'incommoding' the public. We deem it proper to limit this opinion to the class of cases to which this belongs." *City of Brownwood v. Brown Telegraph & Telephone Co.*, 157 S. W. 1165, 1166.

In the *Athens* case, it is said:

"Thus it will be seen that the issue here raised in no sense involves the rights of a distance telephone business, as distinguished from those of a local telephone business, as construed in *S. A. & A. P. R. Co. v. S. W. T. & T. Co.*, 93 Tex. 313 (55 S. W. 117, 49 L. R. A. 459, 77 Am. St. Rep. 884), and the *City of Brownwood v. Brown Telegraph & Telephone Co.* (Sup.), 157 S. W. 1163, where it was, in effect, held that, under Article 1231, R. S. 1911, distance telegraph and telephone companies might pass through towns and villages, using their streets so as not to incommode the public, free from interference by the government of said towns and villages, despite the provisions of Article 1235, which only invests the municipality with power to enforce reasonable regulations in such use of its streets by distance telegraph and telephone companies. The facts in this case show appellant is conducting a local telephone business, and that a different rule with reference to the rights of such companies pertains in law is made clear by Mr. Chief Justice Brown, in the *Brownwood* case, *supra*, by the statement in the opinion that 'it is not to be inferred from this opinion that this company can, without consent of the city, transact the business of a local company.' Concluding, then, from the facts, that appellant was conduct-

ing a local telephone business, and that appellee was free to regulate and control the same in a lawful manner, and that the appellant held the business subject to such regulation, the question then arises, did appellant take the business subject to the terms of the original grant?" *Athens Telephone Co. v. City of Athens,* 163 S. W. 371.

These authorities will be helpful when a case arises under the law as it now stands, and we are asked to decide the rights of a telephone company authorized to erect toll lines over and upon rural highways and city streets under Section 2158 of the Code, and its right to maintain local exchanges under Sections 775 and 776 of the Code. They do support our conclusion as to the effect of Section 775 standing alone, and, on the whole, are authorities for the views herein expressed. Under the general grant found in Section 1324 of the Code as amended, defendant acquired the right to use all the streets and alleys in the city of Des Moines, and they were not deprived of that right by Section 775 of the Code. The city might, under that section, in the exercise of its police or regulatory powers, provide as to how the poles, wires, etc., should be constructed; but it could not arbitrarily exclude the defendant from the use of its streets and alleys. This point is expressly ruled by both the *Chamberlain* and *Nebraska Telephone* cases, *supra,* as will be observed from the quotations made therefrom. In this connection, we may with profit also quote the following, in addition to the extract already taken from the *Chamberlain* case:

"The twenty-second general assembly, by Chapter I of its Acts, provided for a board of public works in all cities of the first class having a population of more than 30,000, and further provided: 'It shall have power and be required by and with the advice of the city engineer to superintend the laying of all water, gas and steam heating mains and all connections therefor, and laying of telephone, telegraph, district telegraph, and electric wires, in the manner provided by the ordinances of such city.' And by Chapter 16 of its Acts, it gave additional

powers to certain cities; among others, the power 'to regulate telephone, telegraph, electric light, district telegraph, and other electric wires, and provide the manner in which and the places where the same shall be placed, upon, along or under the streets and alleys of such cities.' It can hardly be seriously argued that the quoted language from these two acts does not relate to the use of streets and alleys by telegraph and tele- phone companies; and, if the acts do relate to that matter, they must be taken into consideration in construing the telegraph and telephone statute; for it is a rule of universal application that several statutes relating to the same thing must be so con- sidered. . . . If the telephone right of way statute did not confer the power to use streets in cities, the legislature would not have given cities control over the location of the poles and wires. When, however, the statutes are construed together, they are in perfect accord.''

This quotation serves a dual purpose: First, to demonstrate that Section 1324 of the Code of 1873, as amended by the Acts of the Nineteenth General Assembly, gave the defendant the right to use all the streets and alleys of the city of Des Moines; and second, to show that, in its original form, Section 775 of the Code was a mere regulatory statute, and that the change made on the suggestion of the Code Commission, as found in the Code of 1897, was not for the purpose of forfeiting any rights of telephone companies, but to give to cities and towns the right "to include poles as well as wires, and street railway as well as other electric wires; also, to require *regulations* to be uniform and impartial.'' Nothing said in *Farmers Tele- phone Co. v. Washta,* 157 Iowa 447, or *East Boyer Telephone Co. v. Incorporated Town of Vail,* 166 Iowa 226, runs counter to these views. On the contrary, they are in entire harmony with the conclusions here reached. In both cases, the tele- phone companies were attempting to enter cities or towns after the enactment of Sections 775 and 776, and to erect and main- tain local exchanges therein. We may with profit quote the

following from *Farmers Telephone Co. v. Washta,* 157 Iowa 455-458.

"What may be the limit if any, of legislative power, throwing open all public streets and highways to the exploitation of works of real or alleged public utility, without franchise or permission from cities or towns affected by them, we need not here discuss. We may, for the purposes of this case, assume that, under Section 780 of the Code of 1851 and its subsequent re-enactments, prior to the enactment of Sections 775 and 776 of the Code of 1897, the builders of telegraph and telephone lines could rightfully erect their poles and string their wires on every street and alley in each and all of the cities and towns of the state, without regard to the wishes of the several municipalities; but we are satisfied that such power, if it existed, was materially narrowed by the later Code provisions to which we have made reference. The authority given by Section 780 of the Code of 1851 and subsequent re-enactments thereof prescribe undoubtedly the general rule; but it is a rule from the operation of which cities and towns have been excepted or removed by the later legislation embodied in Sections 775 and 776 of the present Code. By the first of these, cities and towns, are empowered to 'authorize' the use of their streets for such purposes, and by the second, the grant of such franchise is made subject to the ratification of the voters of the municipality. To say now that, notwithstanding this statute, the streets of such municipality are open to the entrance of every person or corporation which may be minded to try its hand at the maintenance of a telephone system, without permission of the constituted authorities or the approval of the voters, is to nullify the legislative enactment. On the other hand, by treating Code Section 2158 as stating a general rule, which must be read and applied with due reference to limitations imposed by other statutes relating to the same subject, all may be given due effect.

"The case of *Chamberlain v. Telephone Co.,* 119 Iowa 619,

on which appellants place much reliance, is not here a controlling authority. The telephone line or system there in controversy had been erected, and the rights of the company had vested, under a general statute substantially identical with the present Code Section 2158. This was, however, prior to the enactment found in Code Sections 775 and 776, and the effect of these provisions and the authority and power thereby vested in cities and towns was in no manner discussed or considered. The one thing there considered was the construction of the general statute, authorizing persons and corporations to erect telegraph and telephone lines on all the public highways of the state; and it was held that the words 'public highways' necessarily included city streets, and that the telephone company's rights there were, therefore, not referable to any grant or franchise from the city. With the correctness of that decision upon the issue as there made, we have here no quarrel. What we hold is that the legislature, having now expressly clothed the cities and towns of the state with power to authorize the use of its streets for such purposes, or, in other words, to grant franchises to telephone companies, and having further made the validity of such grants dependent upon their ratification by popular vote, it follows of necessity that a city or town, acting through its constituted authorities, may exclude from its streets the poles and wires of any company or system to which such permission has not been extended. It will not do to say that the extent of the authority given to cities and towns is merely to regulate, and not to authorize or prohibit; for, while it might be possible to torture that meaning out of Code Section 775, if it stood alone, it would leave the succeeding section utterly pointless and of no effect.

"It is to be conceded that cases may be found, and they are cited by counsel, in which statutes, more or less similar to our own, have been shorn of their apparent effect, and construed as giving cities and towns no more than a power of supervision or regulation. The thought which seems to have influenced these holdings, and which is pressed upon our atten-

tion in appellant's brief, is that, where the state—the repository of the sovereign power—has by general statute given telephone and other similar corporations the right to occupy the public highways with their poles and wires, it cannot be presumed that the legislature intended to confer upon cities and towns the right or power to exclude them from their corporate limits.   We do not regard the reasoning by which this conclusion is reached as convincing or persuasive.   It is safe rule to assume that the legislature means what it clearly says. The state may and does delegate certain of its powers to municipal corporations, and if, in its judgment, such corporations can best or most effectually control, improve and protect the streets within their limits, and statutes to that effect are duly enacted, we know of no restriction in the Constitution or in principles of public policy which should impel the courts to construe away their obvious meaning.   It was entirely competent for the legislature to restrict the scope of the right or privilege which had been conferred by Code Section 2158, and this we think it did, by the provisions of the later statute."

We reach the satisfactory conclusion that the defendant has a franchise to operate its telephone system, both long distance and local, upon the streets of the city of Des Moines, and that this franchise has not been repealed or taken away by the legislature.   Defendant is doubtless subject to certain regulatory or police measures, is subject to taxation and to the right of eminent domain; but its franchise has not been forfeited by the legislature, and it should not be ousted from the streets, alleys and public places of the city of Des Moines.

The judgment must, therefore, be and it is reversed, and the cause remanded for a judgment and decree in harmony with this opinion.   *Reversed* and *Remanded*.

All the justices concur, except Weaver and Preston, JJ., who dissent.

WEAVER, J. (dissenting)—I desire to register my dissent from the foregoing opinion, not merely on account of the result

reached in this particular case, but because of the far-reaching evil effect which I am convinced will follow our approval of the doctrines which that opinion affirms. At the outset, I desire frankly to admit that if this court desires to re-affirm and further extend the doctrine of *Chamberlain v. Telephone Co.* and *State v. Nebraska Telephone Co.*, cited by the majority, there is a logical fitness in the reasoning employed by them, unless we are to accord to the effect of the power reserved to the state by our Constitution and statutes greater force and efficiency than my colleagues are disposed to allow. Personally, I believe the view expressed in those cases, to the effect that Section 1324 of the Code of 1873 and its amendments gave every telegraph and telephone company an unlimited privilege to enter upon and occupy every public road and public highway in the open country and every street and alley in every city and town within our state borders without the consent of the local authorities and without compensation, is radically unsound, and I would waste no time in receding therefrom. The language of the statute does not, in my judgment, necessitate such construction, and if the terms of the grant or privilege be in any respect doubtful or open to construction, the doubt should be resolved in favor of the public, as against the person or persons who desire to exploit the opportunity for private profit. But for the purposes of this discussion, I shall assume that those decisions are to stand, and are as binding upon me as upon the majority, until they are overruled, and that they are to be given due effect upon all questions settled therein. What do they settle? Simply this: That, under the terms of the statute cited, the telephone company has the right to make use of the streets of the city without asking the city's consent, and that, having done so, the city, as the law stood prior to 1897, had no power or authority to exclude it therefrom. What the court there says relative to the issues decided is not to be ignored or disregarded by us; but, in so far as its discussion goes beyond those issues, it is dictum which constitutes no authoritative precedent. Those cases do not construe

or determine the effect of the constitutional restriction (Constitution of Iowa, Article 8, Section 12), or of the statute (Code of 1873, Section 1090, identical with Code of 1897, Section 1619), or the later statutes (Code of 1897, Sections 775 and 776), and these provisions are now subject to our examination and construction, unaffected and unembarrassed by what we said or failed to say in the *Chamberlain* case or the *Nebraska Telephone* case.

Let it then be assumed, as said by the majority, that the statute first mentioned, Section 1324 of the Code of 1873, and its amendments, having been accepted by the telephone company by entering upon the city streets and erecting its poles and wires thereon, constituted a contract between the state and the company which the courts are bound to recognize and enforce: what were the terms of the contract, and how long was it to remain effective?

It is a proposition as sound in law as it is obvious to good sense that the law existing at the time the contract was made became, by implication, a part of the agreement; or, stated otherwise, it is presumed that the parties entered into their agreement with reference to the law bearing upon the subject concerning which that agreement was made. Now the principle that a charter to a corporation is a contract protected to the same extent as are agreements between individuals, by the constitutional prohibition of laws impairing the obligation of contracts, thereby making the creature greater than its creator; endowing it with everlasting life, and leaving the public helpless to escape the blighting effects of improvident perpetual grants of corporate privileges, had hardly been settled by the Supreme Court of the United States, in the famous Dartmouth College case, before its inevitably evil effects began to make themselves so manifest that the several states began to take action to hedge it about with statutory and constitutional restrictions. These generally took the form of a reservation of power in the state to limit the existence of corporations thereafter organized, to regulate their business in the public

interest and to withdraw special privileges conferred upon them. That purpose found expression in our own Constitution, where it is provided that:

"The general assembly shall have power to amend or repeal all laws for the organization or creation of corporations, or granting of special or exclusive privileges or immunities  .  .  . ;   and no exclusive privileges, except as in this article provided, shall ever be granted."

Later, another step in the same direction was taken by the legislature, when it enacted Section 1090 of the Code of 1873 (Section 1619 of the Code of 1897), further providing, as part of the general law for the organization of corporations for pecuniary profit, that the articles of incorporation, by-laws, rules and regulations of any corporation thereafter organized should "at all times be subject to legislative control, and may be at any time altered, abridged or set aside by law, and every franchise obtained, used or enjoyed by such corporation may be regulated, withheld, or be subject to conditions imposed upon the enjoyment thereof, whenever the general assembly shall deem necessary for the public good."

These provisions of the Constitution and the statute were in force when the telephone company in this case came into existence and when it acquired all the contract rights which it has in the premises, and the rights so acquired are unquestionably subject to all the expressed reservations in favor of the state.  In other words, the contract was made with the condition and understanding that the exercise of the powers so acquired was subject to legislative control, and that every franchise obtained, used or enjoyed under or by virtue of that contract might lawfully be regulated or withheld, or be made subject to further conditions imposed upon its enjoyment, according as the legislature in its wisdom should believe to be for the public good.  Still further, such contract must have been made with the understanding that if, by its terms, the corporation acquired any special privileges or immunities, they were to be held or retained only so long as the legislature saw

fit to permit it, and that the grant so made was always subject to amendment or repeal, as provided by the cited constitutional provision. If, then, when the corporation has had 30 years of presumably profitable free use of the public streets upon such conditions, it happens that the legislature, in view, possibly, of the increased population, increased congestion of the streets, and improved methods of serving the public convenience, concludes in good faith that it will be for the public good to withdraw the privileges granted to the corporation, or to impose certain conditions upon their further enjoyment, who is wronged? Is not this precisely what the parties agreed upon? If the "innocent investors and third persons" who, in every struggle of this character, are waiting in the anteroom ready to be paraded as a shield of corporate privilege against the demands of public right, raise the familiar cry, it is easy to demonstrate its lack of substantial foundation. Just as the original incorporators entered upon the original enterprise with knowledge of the reserved power in the state to protect itself and the general public by withdrawing the privilege or by imposing new conditions thereon, so did they who invested in its securities, and they suffer neither legal nor moral wrong when the state sees fit to exercise its rights.

The contract which the law implies in the grant of a statutory privilege ought to have some of the elements of mutual obligation which enter into contracts in general; but assuredly, the obligation to which we hold the state in this case is supported by only the flimsiest consideration on the other side. When the statute making the grant was passed, no person or corporation was under any duty to take advantage of it. Having undertaken to establish a telephone system in the city or state, defendant was under no promise to continue the enterprise, but could retire therefrom at any time, on any pretext, without incurring any liability for damages. It pays no rent for the use of the streets, no license or occupation tax. It is free to quit the field and wash its hands of any obligations to the state or city, as if the contract had never

been made. The sole concession or consideration (if it may
be so called) accorded to the state is the right to protect the
interests of the public by the exercise of the reserve power to
which we have adverted; and the value of that reserved power
ought not to be minimized or its purpose frustrated by resolv-
ing every doubt against it.

Coming, then, to our present Code Sections 775 and 776,
it is to be observed that, while the origin of the first section
may be traced in prior legislation, it was, in its present form,
coupled with the succeeding section, and they were together
enacted as parts of the same chapter of the Code, wherein the
legislature sought to embody all the statute law relating to
the use and occupation of the city streets and the rules for
their supervision and control. Then, as now, the streets of
many of our cities and towns were occupied by telephone lines,
the number of corporations being organized for such enter-
prises was rapidly multiplying, and the question of their
proper regulation and control was an important one. This
was the situation the statute was enacted to meet, and to
appreciate its effect, the two sections must be read together.
Thus viewing it, the majority reach the conclusion that the
legislature meant, in Section 775, to grant power to cities and
towns to regulate the matter of poles and wires of all tele-
phone companies, including those organized before, as well as
those organized after, the date of the act; but that, in Section
776, the necessity of obtaining a franchise for the use of the
streets was laid only upon those companies which might there-
after enter the business. While this exposition of Section 775
is somewhat narrower than I would make it, I would not take
the time of the court to dissent therefrom, if this were all that
the opinion holds. But to say that the legislature had in mind
all telephone corporations when it enacted Section 775, but had
reference to a *part* only, when it enacted the next section, is
a conclusion to which I cannot agree. Though the origin of
the first section is, as already said, traceable through some
earlier legislation, and the next section was then for the first

time brought into the statute, they were here coupled together
and enacted as a part of the same chapter, and I fail to under-
stand by what rule of construction or interpretation the same
general language is to be given the broader meaning in one
place and the narrower effect in the other.   The opinion as
written divides public utility corporations of this kind into two
classes: those which had been organized and had secured a
foothold in the state, and those which might thereafter seek
the right to use the streets for a like purpose.   Had the classi-
fication been intended, it was easy to use plain words of unmis-
takeable meaning for such purpose, and not leave this impor-
tant distinction to be discovered and developed by mere con-
struction.   To me, it is inconceivable that an intelligent legis-
lature, engaged in the work of recasting and simplifying the
statute law of the state and putting it in form to be under-
stood and enforced, should fail to make itself clear on this
point, if any such distinction had been intended.   Again, if
the statute be capable of a reasonable construction which will
make it valid, it will be assumed that such was the legislative
intent, as against another construction, which would render it
invalid.   To adopt the idea expressed by the majority is to
say that the legislature intended to separate the telephone cor-
porations of the state, all organized under the same statute
and carrying on precisely the same kind of business, into two
classes, to one of which are given special privileges denied to
the other, and upon the other, are imposed disabilities and
burdens of which the first is relieved.   This, in my judg-
ment, is forbidden by our own state Constitution, Article 1,
Section 6, as well as by the last clause of Section 12 of Article
8 of the same instrument, which, in clear terms, inhibits the
granting of exclusive privileges to any citizen or class of citi-
zens.   Up to that time, the legislature had not attempted in
terms to subject telephone corporations to any control by cities
or towns, an omission which served to hamper these municipal-
ities in the proper care and maintenance of their streets and

to prevent the proper regulation of such companies with reference to the public convenience. The necessity and propriety of such regulation was just as patent, and the relief thus afforded to cities and towns was just as necessary, with respect to companies already organized and doing business, as to those which might thereafter be brought into being. The whole subject was before the legislature, and, under the reserved power to which we have referred, it was clothed with all necessary authority to treat all telephone companies alike, and subject all to like conditions. That it could impose conditions precedent to the authority of corporations thereafter organized to do business will not be doubted, and that it could also impose the same conditions precedent to the continued enjoyment of a franchise already in existence is expressly provided in Code of 1873, Section 1090, which, as we have seen, became a part of the contract which is here relied upon by the defendant. Having, then, the necessary authority to place all corporations doing or desiring to do a telephone business upon the same level, and to condition their right to establish or continue such business upon the same terms, the legislature enacted the Code of 1897, Sections 775 and 776, and used terms of general character which may fairly be construed as applying to all such corporations; and in my judgment, the court ought to give it that effect. Such effect, the majority first seeks to avoid by pointing to the words, "No franchise shall be granted, renewed or extended by any city or town," except in the manner named. It is argued that defendant already had a franchise, and therefore needed no grant or renewal to give it a right to use the streets; and that, the franchise being perpetual, the defendant is not to be placed in the attitude of asking an extension thereof. In the first place, let us remember that a franchise which is subject to repeal or amendment is not perpetual, in any proper sense of the word. Its term of existence is, at most, indefinite, and is subject to termination at any time, at the will of the state, constitutionally expressed. It seems apparent that "extended" is here used in the sense of "con-

tinued," and that the phrase "granted, renewed or extended," in the connection where it is found, is, in effect, a legislative declaration that thenceforth the use of the streets of cities and towns by these public service corporations should be acquired or continued only by consent of the constituted authorities and vote of the people. But the majority argue: (1) That to hold the statute applicable to defendant is to work a forfeiture, and that forfeitures are not favored by the law; (2) that to make such application gives to the statute retrospective effect; (3) that it would be an unconstitutional impairment of the obligation of the contract implied in the original grant and its acceptance, and an unauthorized interference with vested rights. With the utmost respect to my colleagues who differ with me, I insist with all confidence that, of the several legal rules and principles thus invoked in the opinion, not one is applicable to this case.

1. As to forfeiture. To construe the law as I have indicated and give it effect against the defendant is neither to declare nor to enforce a forfeiture. The defendant is made to forfeit nothing. A forfeiture is a taking away or divesting of property or property rights, because of some default or offense. *Union Glass Co. v. First Nat. Bank,* 10 Pa. Co. Ct. R. 565,572. It relates to loss of property or right because of something its owner has done or omitted to do. *Cassell v. Crothers,* 193 Pa. 359. A forfeiture is a penalty. *Gosselink v. Campbell,* 4 Iowa 296, 300. It is a deprivation or destruction of a right in consequence of a non-performance of some obligation or condition. *Webster v. Dwelling House Ins. Co.,* 53 O. St. 558.

The last definition, stated by the Ohio court, is probably as apt and complete as can be found anywhere, and accords perfectly with the ordinary employment of the word by lawyers and courts. A moment's reflection will make it plain that there is nothing of that nature in this case. It is not claimed by plaintiff that defendant has, by its failure, default or misconduct, forfeited or lost any right it had in the prem-

ises. No forfeiture has been declared, and none is now urged. The position taken is—and it is impregnable—that the power to impose a new or additional condition upon the use of the streets was reserved in the original contract, and that such power and such only has been exercised, not to punish or take advantage of the defendant for any default, but to impose other conditions upon the enjoyment of the franchise which are believed to be for the public benefit and in strict accordance with the contract. The reservation of such power by the statute and the Constitution, though not expressed or repeated in the grant itself, was, nevertheless, as much a part of the contract as if it had been so expressed. *Tomlinson v. Jessup*, 82 U. S. 454. After holding that the reserved power justified the state in afterwards withdrawing a valuable privilege attached to the franchise, the court, in the cited case, notices the objection made concerning its ill effects upon the interests of persons investing in the corporate stock, and dismisses the objection by saying that the original incorporators and subsequent stockholders took their interests with knowledge of the existence of this power and the possibility of its being exercised at any time, in the discretion of the legislature. Further, as to the reserved power, the court says that these provisions "constituted the condition upon which every charter of a corporation subsequently granted was held, and upon which every amendment or modification was made. They were as much a part of the charter as if incorporated into them." And this is true whether the reservation be made in the Constitution or in an existing general law enacted by the legislature. *Miller v. State*, 82 U. S. 478; *Macon & B. R. Co. v. Gibson*, 85 Ga. 1, 15; *Western N. C. R. Co. v. Rollins*, 82 N. C. 523, 529. In none of the very numerous cases treating of the exercise of the power reserved by the state to repeal the grant or to alter its terms will there be found any suggestion that its application serves to work a forfeiture.

2. The point that to hold this statute applicable to defendant is to give it retroactive effect rests upon a misap-

prehension as to when a statute is retroactive and subject to
the rules cited by the majority.  Turning to the books, we
find that the Supreme Court of the United States has defined
the term as follows:

"A retrospective law is one which changes or injuriously
affects a present right by going behind it and giving efficacy
to anterior circumstances to defeat it, which they had not when
the right accrued." *Poole v. Fleeger,* 36 U. S. 185.

It has also been defined as one that relates back to and
gives to a previous transaction some different legal effect from
that which it had when it happened.  *State v. Whittlesey,* 17
Wash. 447.  Again, it is said to be one intended to affect trans-
actions which occurred or rights which accrued before it be-
came operative as such, and ascribes to them effects not in-
herent in their language in view of the law in force at the
time of their occurrence.  *Chicago, B. & Q. R. Co. v. State,*
47 Neb. 549.

Under no definition here given or any other I have been
able to discover can Code Sections 775 or 776 be said to have
retroactive effect, if given the interpretation asked by the
plaintiff.  This statute applies only to conditions then existing
and such as might thereafter arise.  The effectiveness of the
act does not reach back beyond the day when it was duly
passed, approved, and published.  The legislature could not,
of course, impose liability upon the defendant for failure in
the past to discharge a duty which had not been previously
imposed upon it, nor is anything of that kind implied in the
statute as I am reading it.  Nor—to get still closer to the point
of this issue—could the legislature impose upon the defend-
ant's enjoyment of its franchise any new burden not within the
scope of its reserved power.  It does, indeed, impose a new
condition, but that is precisely what its contract in express
words allows it to do.  To keep that matter clear, let me again
repeat that clause of the reservation (Code Section 1619) :

"And every franchise obtained, used or enjoyed by such
corporation may be regulated, withheld, or be subject to con-

ditions imposed upon the enjoyment thereof, whenever the general assembly shall deem necessary for the public good.''

To require the defendant, as an additional condition of the enjoyment of its franchise, to conform to the law imposed upon other corporations of its kind is, therefore, strictly within the terms of the agreement. The condition has no retroactive effect, but has reference solely to the future use of such franchise.

Perhaps it is as well that we here take notice of a proposition which seems to be glanced at in the majority opinion and distinctly announced in a few decisions by other courts— quite notably in *Iowa Telephone Co. v. Keokuk*, 226 Fed. 82— to the effect that powers reserved to the state by the constitutional and statutory reservations to which I have referred have reference only to the franchise or right to be a corporation, and not to the franchises or contract rights which such corporation may obtain or acquire in carrying out the purposes of its organization. In the case referred to, after noting the distinction between a franchise to exist as a corporation and a franchise subsequently acquired by contract with or grant from a city or town, the court proceeds to say:

''The provisions of the Code and the Constitution, as aforesaid, clearly have reference to the powers granted to a corporation, and have no relation to the property rights of a corporation acquired under such powers. The corporation being a creature of statute, the legislature expressly reserved the right to change the powers granted and to take away such powers at any time. This reservation authorized the state to even dissolve a corporation and destroy all its functions; but even this would in no manner affect property rights acquired by it before its dissolution or destruction.''

Going still further in this direction, it is declared that, while the state may thus dissolve the corporation itself, and the franchise to exist in such capacity may be lawfully destroyed, the acquired franchise obtained by the corporation in its lifetime ''continues unimpaired.'' In other words, no

matter what changes the passing years may bring in condi-
tions of public service or public convenience, no matter that
a franchise granted by a city to a corporation under the easy-
going policy of pioneer days proves in later practice to be a
clog upon municipal progress and oppressively burdensome
upon the people intended to be served, the state has rendered
itself impotent to do more than to cancel the corporate charter,
leaving the franchise itself, the one thing from which relief is
needed, "unimpaired," to hang as an unbreakable iron ring
welded about the public neck until the "heavens shall pass
away and the elements shall melt with fervent heat." Indeed,
when that great cataclysm shall occur, I am not at all certain
that legal ingenuity will not rise to the occasion and announce
some solemn formula to render that ring infusible in the final
conflagration. Justice to my colleagues at this point requires
me to admit that they endeavor to limit their discussion to the
proposition that the legislature has not in fact attempted to
exercise its reserved power and to withhold any opinion upon
the extent of that power until a case shall arise which, in their
judgment, properly presents it. But believing, as I do, that
Code Section 776 does embody a purpose to give effect to that
power, I cannot refrain from going into the subject more
generally than does the opinion. Moreover, while cheerfully
assuming that such is not the intention of the majority, I am
convinced that the logical and inevitable trend of the opinion
is so strongly towards the proposition affirmed by the Federal
court in the *Keokuk* case as to foreclose its free consideration
when a case comes before us which confessedly does raise the
point. In this belief, and in the conviction that the adoption
of the theory of that case into the law of this state would be
little less than calamitous, I find justification for this dissent.

Before leaving the subject, it is proper to recall the rule
that the courts of the state are vested with final authority upon
the construction and interpretation of its own statutes, and to
note that this court has already put a construction upon our
statutory reservation of power with respect to corporations,

wholly at variance with that set forth in the *Keokuk* case. *Sioux City Street R. Co. v. Sioux City,* 78 Iowa 742. There, the railway company obtained the grant of a franchise from the city. By the terms of the grant, whenever the city undertook to pave any street occupied by the railway company, it was required to pave the space between its rails, and no more. Later, and after the franchise had been accepted, a statute was enacted by the legislature authorizing cities to require street railway companies to pave, not only the space between the rails, but an additional space of one foot on either side. This statute, let it be noticed, was general in its terms, and, as in Section 776 of the Code, nothing was said differentiating between corporations obtaining grants before its enactment and those thereafter obtaining them. Thereafter, the city, undertaking to pave certain streets, assessed against the company the expense of paving the space between the rails and one foot outside thereof, as provided by the statute, and the company took the matter into the courts, denying its liability and advancing the same reasons therefor which are relied upon by the defendant in this case. The trial court ruling in favor of the city, an appeal was taken to this court, where it was argued that, the grant of the franchise having been accepted, it had the force of a contract, the obligation of which neither the state nor the city could impair by imposing upon the company new or additional burdens. Overruling the point, the court referred to Code Section 1619, which we have already quoted, and said:

"The state reserved the power *not only to repeal or amend* the articles of incorporation of such corporations as should be organized after its enactment, but to *impose such conditions upon the enjoyment of the franchises obtained thereunder* as the general assembly might deem necessary for the public good. Plaintiff's franchise consists of the privileges, powers and rights conferred upon it by the general statutes and its articles of incorporation, but it assumed them *subject to the right and power reserved to the state by the statute.* The reserva-

tion was a condition of the grant.   Now the object of plaintiff's
organization was to construct, maintain and operate street
railways and other railways in the city and adjacent thereto.
*The power and privilege of doing that particular thing are its
franchise.*   The act of the twentieth general assembly, as
applicable to it, imposes it *as a condition upon which it may
enjoy that franchise* that, when the city determines that the
street shall be paved, it shall bear the cost of paving between
its rails and one foot in width outside of them.   That the gen-
eral assembly had the power under the reservation to impose
the condition, we think *there can be no doubt.*"

The distinguished writer of that opinion, Reed, J., is still
living; and if the precedent so established shall have its proper
effect to save the state and its municipalities from the thrall-
dom with which the other theory threatens them, he may con-
gratulate himself upon his title to the gratitude of the people
whose service he has honored.   Appeal from that decision was
taken to the Supreme Court of the United States and there
affirmed (138 U. S. 98).   The point was there distinctly made
that the ordinance or contract between the city and the com-
pany was neither part of the articles of incorporation nor of
its by-laws, rules or regulations, and that it was not a fran-
chise, within the meaning of the statutory reservation of power.
This contention, which is the identical proposition affirmed in
the *Keokuk* case, was distinctly disapproved.   The court says:

"The company took its franchise subject to such legisla-
tion as the state might enact.   This is plain from the provision
of Section 1090 of the Code (Section 1619 of the present
Code).   .   .   .   The legislature had the power *not only* to
repeal and amend the articles of incorporation of the com-
pany, but *to impose any conditions* upon the enjoyment of
its franchise which the general assembly might deem necessary
for the public good.   The reservation of this power was a
*condition of the grant.*"

Again, the court says:

"*The right to operate the railway in the streets is a fran-*

*chise* obtained through the power given to the city by the state, but the state reserved the power to regulate *such franchise and impose conditions upon it.''*

Finally the court says—and to this I call special attention, because of its direct bearing on the further suggestion in the majority opinion that to give the statute force as I construe it is to find ourselves at variance with the constitutional provision against impairing the obligation of contracts:

*''No question can arise as to the impairment of the obligation of a contract, when the company accepted all of its corporate powers subject to the reserved power of the state to modify its charter and to impose additional burdens upon the enjoyment of its franchise.''*

This ruling, which obviates the objection that my construction of the statute would work an unconstitutional impairment of the contract, is so direct and authoritative that further argument along that line is unnecessary. That objection being removed or overruled takes with it the further assertion of ''vested rights.'' The corporation has no rights which are so vested as to be immune against the proper exercise of the state's reserved power. It has, of course, the right to acquire and accumulate property, of which neither state nor city can deprive it, save as follows: If, as may well happen with respect to some species of corporate property, the proper exercise of the reserved power of the state operates to destroy or diminish its value, or interfere with its profitable use, it is *damnum absque injuria;* for, the right of the state so to do being provided for in the contract, the resultant injury is not a wrong. But, so far as the corporation has or acquires property or rights which are beyond the sphere or scope of the powers reserved by the state, they are protected as sacredly and by the same guaranties as are those of a natural person. Under our law, therefore, the right of a corporation to hold and enjoy a public franchise by grant from a city or town is a right obtained and held subject to the control of the state, and its enjoyment is subject to such additional conditions as the

state may, in its wisdom, from time to time place upon it. The subject is thoroughly considered in *Greenwood v. Freight Co.*, 105 U. S. 13 (26 L. Ed. 961). There, a street railway corporation known as the Marginal Company obtained by act of the legislature the grant of a franchise to construct and operate a railway upon the streets of Boston. The grant was accepted and certain lines of the railway constructed. Five years later, another railway company was, by a similar act, authorized to construct another railway along and upon the same streets, and to condemn for such use the railway of the first company. The validity of the last grant was contested in the courts, on the ground of its alleged interference with the rights which had vested under the original grant. The case having reached the Federal court of last resort, the second grant, which wholly destroyed the franchise of the original company, was held to be a valid exercise of the power reserved to the state to amend or repeal the act of incorporation. Speaking of the effect of the repeal of a corporate charter, the court says:

"One obvious effect is that it (the corporation) no longer exists. Its life is at an end. Whatever force the law may give to transactions into which the corporation entered, and which were authorized by the charter while in force, it can originate no new transactions dependent upon the power conferred by the charter. . . . Personal and real property acquired by the corporation during its lawful existence, rights of contract, or choses of action so acquired, and which do not in their nature depend upon the general powers conferred by the charter, are not destroyed by such a repeal. . . . It results from this view that, whatever right remained in the Marginal Company to its rolling stock, its horses, its harness, its stables, the debts due it, and the funds on hand, if any, it no longer had the right to run its cars through the streets, or any of the streets, of Boston. . . . Whether this action was oppressive or unjust, in view of the public good, or whether the legislature was governed by sufficient reason in thus repeal-

ing the charter of one company and in chartering another,
. . . is not, as we have seen, a judicial question in this
case."

So the Massachusetts court, after upholding the right of
the state to create a corporation and reserve the right to con-
trol it, says that the legislature may "grant absolutely or on
condition; so they may grant during pleasure, or until a cer-
tain event happens. And *if a grant be accepted on the terms
prescribed, it becomes a compact, and the grantees can have
no reason to complain of the execution of their own contract.*"
*Crease v. Babcock,* 23 Pick. (Mass.) 334, 342. See, also,
*McLaren v. Pennington,* 1 Paige Ch. (N. Y.) 102, 107.

A corporation was chartered in the state of Maine in the
year 1833, when a general statute was in existence, reserving
to the state the right to repeal or amend the charter.  In 1839,
another general statute was enacted, charging stockholders in
corporations chartered after 1831 with personal liability for
corporate debts.  The company thereafter contracted a debt
which the creditor undertook to enforce against one of the
stockholders.  His right to do so was sustained on the theory
that placing this additional burden upon the stockholders was
within the reserved power of the state.  The court adds this
pertinent remark:

"If the corporators were not satisfied with their indi-
vidual liabilities, they had it in their power to cease incurring
them."  *Stanley v. Stanley,* 26 Me. 191.

So, too, this court, in an early period of its history, reply-
ing to the complaint that the exercise of the reserved power
was a hardship upon the corporation and possibly destructive
of its property, said:

"If the corporation have suffered from the undue exercise
of such power, they have only to censure themselves for the
folly of accepting the grant upon the terms specified."  *Min-
ers' Bank v. United States,* 1 G. Greene 553, 563.

This case is cited in our recent case, *State v. Des Moines
City R. Co.,* 159 Iowa 259.  The opinion in the latter case,

written by Deemer, J., discusses very thoroughly and convincingly several principles having an important bearing upon the case in hand, and may be studied with profit.

To recapitulate: The reserve power in the state to impose upon defendant the duty of compliance with the same terms which are required of all other telephone companies is clear and ample; the general terms of Code Section 776 are broad and general enough to include the defendant, and, as a matter of even-handed justice, it should be so applied; to thus enforce it neither impairs the obligation of the contract implied in the grant nor interferes with any vested rights; and it neither declares nor works a forfeiture; nor does it have any retrospective effect. It is the wise policy of this state to grant no exclusive rights, and to place upon a common level of right and of opportunity before the law all persons pursuing the same lawful business, and to grant no special public privileges which are not terminable whenever the state, acting through its proper authorities, shall find such action promotive of the public good.

For the reasons stated, I dissent from the opinion expressed by the majority, and would affirm the judgment below.

PRESTON, J. (dissenting.)—I also dissent. In my opinion, the reserved power exists, as contended for by appellee, and that question is in the case for determination. I concur in Justice Weaver's conclusion that, by Sections 775 and 776 of the Code, the legislature has exercised the power. I would affirm.